[Civ. No. 18207. First Dist., Div. One. Sept. 30, 1959.]

NEIL F. HILDEBRAND et al., Plaintiffs and Respondents, v. STONECREST CORPORATION (a Corporation), Defendant and Respondent; KING'S MARKET (a Partnership) et al., Appellants.

Fred Leuenberger, Leuenberger & Feldman and Herbert Chamberlin for Appellants.

Marvin G. Giometti and Arguello, Giometti & McCarthy for Plaintiffs and Respondents.

Young, Rabinowitz & Chouteau and Walter C. Chouteau for Defendant and Respondent.

WOOD (Fred B.), J.—Plaintiffs Neil and Grace Hildebrand own and operate the Broadmoor Pharmacy in a shop-

ping area called the Broadmoor Shopping Center, at premises leased from defendant Stonecrest Corporation "for the purpose of conducting . . . a drug store and for no other purpose," the lessee agreeing not to use or permit the demised premises to be used for any other purpose.[1] The defendant lessor agreed not to lease or sublet any other space in the area for a drug store, nor permit the sale of "drugs, medicines, or cosmetics" at the supermarket owned and operated by the other defendants, Michael Jacobs and Abram Miller, copartners doing business under the name of King's Market.[2]

Defendant King's Market operated in the same shopping center as plaintiffs under a lease from defendant Stonecrest Corporation, agreeing to use the premises "for the purpose of sales of merchandise to the public, consisting of groceries, vegetables, fresh and smoked meats and fish, delicatessen, candies, bakery goods, beers, wines and liquors, ice cream, and other kindred items commonly sold in super markets, and shall be confined in the use of said premises to the sale of the foregoing." (§ 3 of the lease.) It was further agreed that "all the agreements herein contained on the part of the Lessees, whether technically covenants or conditions, shall be deemed to be conditions for the purposes hereof, conferring upon the Lessor, in the event of breach of any of said agreements, the right to terminate this lease, but in those instances where notice hereof is required, only after such notice for the length of time and served in the manner in these presents provided."

---

[1] The pertinent provisions of sections 2 and 39 of plaintiffs' lease read as follows:

"2. Lessee shall not use, or permit said premises or any part thereof, to be used, for any purpose or purposes other than the purpose or purposes for which the said premises are hereby leased; . . ."

"39. Lessee shall use said premises for the purpose of a retail drug store for the sale of merchandise to the public, consisting of drugs and kindred merchandise usually handled in such retail drug stores. Lessee further agrees that it will not carry for sale, offer for sale, or sell in said demised premises any liquors, any beverages, any candy other than bar candy and bag candy, any bulk ice cream, any commercially packaged ice cream, or kindred items, and that the use of said demised premises will be confined to sale of drugs and kindred merchandise as authorized above."

[2] In paragraph 40 of plaintiffs' lease, the defendant lessor agreed that it "will not rent or lease any space in any building or store now owned or subsequently owned in said area to any person or persons for the purpose of conducting a drug store, nor will it permit the sale of drugs, medicines, or cosmetics in the Super-Market, known as 'King's', #2350 Junipero Serra Boulevard, Daly City, California."

King's Market opened for business in September of 1948. At that time Rawson racks (a type of shelf stocked with miscellaneous commodities supplied and serviced by the Rawson company) were installed. The Rawson shelves included ''O'' type items. ''O'' type items consist chiefly of tooth pastes, tooth powders, shaving preparations, shampoos, soaps, deodorants, first aid supplies, and miscellaneous drugs and laxatives not requiring a prescription. These ''O'' type commodities were advertised by King's Market, along with other items, in a newspaper advertisement appearing September 30, 1948.

Plaintiffs' pharmacy was opened for business in December of 1948. Shortly thereafter King's Market ceased to carry the ''O'' type items.

In November, 1954, defendant Jacobs asked Charles Hildebrand, the manager of the pharmacy, if plaintiffs would object to the installation of a Rawson rack in King's Market. He was informed that there would be an objection. However, on November 15, 1954, the ''O'' type items were again offered for sale at King's Market. November 19, 1954, plaintiffs complained by letter to Stonecrest and were informed that the matter would be investigated. Plaintiffs' letter was forwarded by Stonecrest to defendant Jacobs, with a covering letter dated November 26, 1954. Near the end of November, plaintiff Neil Hildebrand, in a telephonic conversation with Arthur F. Schumacher, general manager of Stonecrest, repeated his earlier complaint regarding the sale of ''O'' type commodities by King's Market. Schumacher testified that he thereupon spoke to defendant Jacobs several times but that Jacobs ''continued to make the argument that the rack did not contain any items that were in violation of . . . [the] agreement or understanding, [that] they were not drug items in the true sense of the pharmacy; that in the case of the cosmetics they were incidental, that he would agree to remove those, . . .'' On January 19, 1955, the ''O'' type items were again withdrawn.

Charles Hildebrand testified that sometime in January of 1955 he was again engaged in a conversation with Jacobs, at which time Jacobs asked if there would be an objection to instituting the Rawson rack. Hildebrand informed him that there would be, whereupon Jacobs replied that he would not honor the objection.

Under date of May 10, 1955, Stonecrest wrote a letter to defendants Jacobs, Miller and King's Market to confirm their verbal agreement that the addressees would not carry drugs,

medicines or cosmetics that would be in conflict with the merchandise offered by plaintiffs at their pharmacy.[3] Defendants Jacobs and Miller appended the word ''Accepted :'' and signed their names thereunder.

On May 16, 1955, the ''O'' type items were again stocked by King's Market. From that date to the time suit was filed these commodities were offered for sale.

Sometime in May of 1955, Charles Hildebrand complained to Stonecrest regarding the renewed sale of ''O'' items by King's Market. On June 8, 1955, plaintiffs through their attorney sent written notice to Stonecrest demanding that the sale of these items be stopped. This letter called attention to section 40 of plaintiffs' lease and declared that the provisions thereof were being violated. There appears to have been no further communication between plaintiffs and any of the defendants,

The judgment declares that Jacobs, Miller and King's Market, a copartnership, are not entitled to sell drugs, medicines and cosmetics to the general public in premises at Broadmoor Shopping Center leased from Stonecrest, states that the term ''drugs, medicines and cosmetics'' includes but is not restricted to certain items (including, for example, Sal Hepatica, cold tablets, tooth powders, hair tonics and shampoos, cough syrup, vaseline, Tums, permanent wave kits, band-aids, cotton, gauze and bandages), and enjoins them from selling and displaying the same. In addition, it awards plaintiffs judgment against Stonecrest in the amount of $21,000,

---

[3]The body of the letter reads as follows: ''This letter will confirm our verbal agreement in connection with the cooperation by the merchants of Broadmoor Village in the matter of offering for sale various articles of merchandise. In accordance with this agreement, we quote paragraph 39 of our lease with Neil F. Hildebrand, 'Broadmoor Pharmacy', dated October 4, 1948.

'' 'Lessee shall use said premises for the purpose of a retail drug store for the sale of merchandise to the public, consisting of drugs and kindred merchandise usually handled in such retail drug stores. Lessee further agrees that it will not carry for sale, offer for sale, or sell in said demised premises, any liquors, any beverages, any candy other than bar candy and bag candy, any bulk ice cream, any commercially packed ice cream, or kindred items, and that the use of said demised premises will be confined to sale of drugs and kindred merchandise as authorized above.'

''In exchange for this consideration on the part of Mr. Hildebrand, you agree that you will not carry for sale, offer for sale, or sell in King's Market, No. 2350 Junipero Serra Blvd., any drugs, medicines, or cosmetics that would be in conflict with merchandise offered by Mr. Hildebrand in his drug store.

''Will you kindly confirm this agreement by affixing your signature as provided for below.''

164

and a like amount in favor of Stonecrest against the other defendants.

■ Stonecrest's obligation to the plaintiffs and its liability for violation of that obligation seem abundantly clear. (See *Medico-Dental etc. Co.* v. *Horton & Converse*, 21 Cal.2d 411 [132 P.2d 457] ; *Kulawitz* v. *Pacific etc. Paper Co.*, 25 Cal.2d 664 [155 P.2d 24] ; 30 Cal.Jur.2d 178, Landlord and Tenant, § 52; 32 Am.Jur., Landlord and Tenant, § 145.)

Stonecrest seeks to escape liability upon the theory that it relied upon the other defendants to adjust their differences with plaintiffs. That is no defense. Stonecrest had solemnly promised not to ''permit the sale of drugs, medicines, or cosmetics in the Super-Market, known as 'King's.' '' (§ 40 of its lease to plaintiff.) It could not abrogate that obligation, or excuse itself from performance of that duty by seeking to delegate its performance to others, especially to the very persons from whose competition that promise was made for the protection of the plaintiffs.

■ The claim is made that no damages should have been awarded for breach of Stonecrest's promise after April 27, 1956, the date when Stonecrest sold the property to third parties. Section 31 of the lease with plaintiffs declared that such a sale would ''operate to release the Lessor from any further liability upon any of the covenants or conditions . . . in favor of the Lessee.'' This point is not well taken. There was no such issue framed by the pleadings. The amended complaint pleaded lessor Stonecrest's promise not to permit the sale of drugs, medicines or cosmetics in the super-market known as ''King's'' by setting forth the very text of section 40 of plaintiffs' lease.[4] Stonecrest in its answer admitted that obligation by not denying the portion of the complaint which alleged it. Nowhere in the complaint or in the answers of any of the defendants was there any mention of section 31 of plaintiffs' lease or the subject matter thereof. That subject (release of lessor upon sale of the property by it) was of course not within the contemplation of the parties because the complaint and the respective answers were filed a number of months prior to the sale.

During the trial after making proof of the sale Stonecrest tendered and filed an amendment to its answer which simply stated that on April 27, 1956, Stonecrest conveyed all of its right, title and interest in the premises to Elsie K. Stern and

---

[4]For the text of section 40, see footnote on page 180 above.

Percy Stern Foundation and ever since said time "has no right, title or interest in and to said premises." This amendment made no mention of Section 31 of the lease or the subject matter thereof. Obviously it tendered only the fact of the conveyance. It presented no question of "release" from "further liability" (under § 31 of the lease) upon its promise not to permit the sale of drugs, medicines or cosmetics at King's Market. Stonecrest continued bound by its admission of the making of that promise. In such a situation the principle which requires a release to be specially pleaded is peculiarly applicable. (See *Baker* v. *Ferrel*, 78 Cal.App.2d 578, 579 [177 P.2d 973]; 2 Witkin, California Procedure, 1530.) No one is claiming that the mere sale of the property relieved Stonecrest of the burden of its obligation.

 The finding that the term "drugs, medicines and cosmetics" included the nonprescription drugs and other preparations mentioned (such as tooth powder, hair tonic, shaving soap, cotton, gauze and bandages), known as "O" type commodities, is supported by the evidence. Defendants concede that there was a conflict of testimony on this subject.[5] They would have us decide that the "testimony that they were not 'cosmetics' or 'medicines' " is the more persuasive of the conflicting views expressed by the witnesses. The view expressed by the trial court was a reasonable one, adopted in the exercise of its function of weighing and appraising the evidence. It is not our function to try to disturb that determination even if we were inclined to take the opposite view, which we are not.

Besides, the defendants' own interpretation (evidenced by twice withdrawing the "O" type products upon plaintiffs' protest and by formulating and signing the letter agreement of May 10, 1955) coincided with that of the trial court.

 Concerning the amount of damages, the trial court found (1) defendants other than Stonecrest continuously sold the proscribed articles, commencing in May of 1955, their average monthly receipts thereof being $2,500; (2) immediately upon the commencement of such sales, the volume of

---

[5]Jacobs, Miller and King's Market say this in their opening brief: "As pointed out in the summary of material facts herein there was testimony that dentrifices, denture powders, shampoos, and shaving preparations were 'cosmetics.' There was testimony that they were not. There was testimony that cotton, gauze, bandages, and band-aids were 'medicines'. There was testimony that they were fabrics and not 'medicines.' " Defendant Stonecrest has indicated it concurs; i.e., there was such a conflict in the evidence.

sales at plaintiffs' pharmacy declined and a loss of profits ensued; the loss in volume of sales and the loss in profits have been continuous; (3) upon cessation of such sales by defendants a period of time will be required for plaintiffs to regain their loss of volume and profit; the loss of profit to plaintiffs is $21,000.

Evidence bearing on damages included financial statements of the pharmacy from January, 1951 through the first nine months of 1956. The approximate monthly gross receipts from the sale of the items in controversy by King's Market was shown to range between $2,000 and $2,500. Dr. David Kendrick, an instructor of economics of the University of California, College of Pharmacy, estimated the loss of profits. This estimate was derived from computations using the annual sales volume for each year beginning with 1951. These computations were used as a basis for computing a "trend line" which presumably predicts future sales. These anticipated sales volumes for 1955 and 1956 were then compared with the actual volume of sales for 1955 and 1956 to arrive at the loss of profits. This analysis led Kendrick to conclude that plaintiffs had suffered a loss of profits of $7,372.91 in 1955 and $11,796.65 in 1956 as a result of the competitive sales by King's Market. Plaintiff Neil F. Hildebrand and his brother Charles Hildebrand testified that on the commencement of sales of "O" type commodities at King's Market, there was a decrease of $50-75 per day average of cash register receipts, in the volume of customer traffic, in the number of transactions and in the volume per customer.

The defendants question the sufficiency of plaintiffs' evidence on several grounds. They criticize the method of proof and contend that plaintiffs' record of purchases and sales of the specified items in controversy should have been introduced (instead of a record of sales of all commodities stocked by the pharmacy). The plaintiffs rely on *Flagg* v. *Andrew Williams Stores, Inc.*, 127 Cal.App.2d 165 [273 P.2d 294], decided by this court, for the proposition that it is not necessary to prove a decline of sales, since damages can be predicated on a loss of expected growth.

As another ground for urging that the award is not supported by substantial evidence, the defendants cite a number of factors which, they say, militate against a finding of damages occasioned by defendants' conduct. Plaintiffs testified that in 1955 they initiated a different system of merchandizing. The new system resulted in management changes, the curtail-

ing of hours and days in which the pharmacy remained open and changes in advertising method and expenditure. Moreover, between March, 1954, and February, 1955, three new pharmacies opened, some of which were located in the area normally serviced by the Broadmoor Pharmacy (one in March, 1954, one in October, 1954, and a third in February, 1955).

Those were all problems of fact which it was the function of the trial court to resolve and it did resolve. ▉ Findings of fact may not be rejected merely because there is evidence which might authorize a different result. (*Sheward* v. *Magit*, 106 Cal.App.2d 163, 166 [234 P.2d 708].) ▉ Moreover, "one whose wrongful conduct has rendered difficult the ascertainment of the damages cannot escape liability because the damages could not be measured with exactness" (*Flagg* v. *Andrew Williams Stores, Inc., supra*, 127 Cal.App.2d 165, 174, quoting from *Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297-298 [149 P.2d 177].) ▉ In the instant case, the following seems particularly apt: "There may be some element of uncertainty but not such a degree of uncertainty as to render the testimony speculative. There is no uncertainty as to the fact of damage, that is, as to the nature, existence or cause of the damage. The same certainty as to the amount of the damage is not required." (Pp. 173-174 of 127 Cal.App.2d.) ▉ It cannot be said, as a matter of law, that the findings as to damages herein are not supported by substantial evidence.

▉ Defendants Jacobs, Miller and King's Market say it was improper to award damages in favor of Stonecrest upon its cross-complaint because it sought only declaratory relief. Stonecrest did state a good cause for declaratory relief and prayed for "a declaratory judgment . . . declaring and adjudicating the rights and duties of the cross-complainant and cross-defendants." But it pleaded all the facts material to an action for damages and also prayed for general relief. We find it was well within the scope of the discretionary function of the trial court to accord the relief it did grant to Stonecrest. (See *City of Los Angeles* v. *City of Glendale*, 23 Cal.2d 68, 81 [142 P.2d 289]; *Record etc. Co.* v. *Pageman Hold. Corp.*, 42 Cal.2d 227, 234 [266 P.2d 1]; *Beeler* v. *Plastic Stamping, Inc.*, 144 Cal.App.2d 306, 309 [300 P.2d 852].)

▉ Defendants Jacobs, Miller and King's Market claim that their lease with Stonecrest does not preclude the display and sale of "O" type commodities. They say such commodities qualify under section 3 of their lease which declares they

168

shall use the premises for selling "merchandise to the public, consisting of *groceries*, vegetables, . . . meats and fish, . . . candies, . . . wines and liquors, ice cream, *and other kindred goods commonly sold in supermarkets . . .*" (Emphasis added.)

They argue that this language is sufficiently broad to encompass the "O" type commodities. They contend that such items as tooth paste, tooth powders, shampoos, soaps, and shaving preparations are commonly sold by supermarkets. This fact they claim is attested by the advertisement carried by them in a newspaper in September, 1948. Moreover, in their view, the term "groceries" in modern usage means more than merely food items. (Webster's International Dictionary, 2d ed., defines "grocer" as: "a dealer in tea, sugar, spices, coffee, fruits, various other commodities, chiefly foodstuffs.") It would place a somewhat strained construction on the word "groceries" to construe it to include the items in dispute.

█ The defendants next suggest that "supermarket" means something more than "market." This distinction was made in *Fricke* v. *Braden,* 55 Cal.App.2d 266, 270-271 [130 P.2d 727], where, however, the distinction related to the physical boundaries intended by the terms of the contract. In further support of their position, defendants cite section 4057 of the Business and Professions Code which provides that certain drugs, chemicals and medicines may be sold by vendors generally, including grocers. Obviously, this statutory provision has little application to the determination of the restrictions contained in the lease.

█ Stonecrest contends that the conduct of defendants Miller and Jacobs in removing the "O" type commodities from sale on two separate occasions is indicative that under the terms of the lease the defendants in their own minds knew that they had no right to sell the items in controversy, citing *Wells* v. *Wells,* 74 Cal.App.2d 449, 458 [169 P.2d 23]. This conduct of Jacobs and Miller is some indication that they understood that their lease bars the sale of the items in question. This is significant as it relates to the original intent of the contracting parties.

Their signing of the letter-agreement of May 10, 1955, is also indicative of such an interpretation by the parties to that lease, a species of admission that that is what it means. Stonecrest's views in this regard are more persuasive *to* us than those of the other defendants.

█ Jacobs, Miller and King's Market claim it was

improper to make an award in favor of Stonecrest against King's Market, a copartnership, because in the caption to the cross-complaint the partnership was not mentioned. Jacobs and Miller, who made up the partnership, were there named simply in their individual capacities. Likewise, in the body of the cross-complaint, they were designated merely as individuals. This point is well taken. The partnership was not made a party cross-defendant by the allegations of the cross-complaint. (See 2 Witkin on California Procedure 1016-1017, § 39, and 1209-1210, § 233; 39 Cal.Jur.2d 693-696, Partnership, § 87; and authorities cited in each.)

The record upon this appeal has been augmented, by stipulation, to include a letter from Stonecrest to the person to whom it sold the property in April of 1956. In this letter, Stonecrest guaranteed to hold the purchaser, ''harmless from any liability under and pursuant to any judgment obtained in the said lawsuit,'' presumably this lawsuit. This evidence was not before the trial court. It was discovered by plaintiffs after the trial. We see no need to consider it in view of the failure of the defendants to present to the trial court, by their pleadings, the question whether Stonecrest had obtained a release under section 31 of plaintiffs' lease.

The judgment is amended by striking from paragraph 5 thereof (monetary award in favor of Stonecrest Corporation) the words ''King's Market, a copartnership.'' As thus amended, the judgment is affirmed. Plaintiffs Hildebrand will recover their costs on appeal. Defendant Stonecrest Corporation will recover its costs on appeal to the extent said costs relate to the appeal of Jacobs, Miller and King's Market from the award against them and in favor of Stonecrest.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied October 26, 1959.