[No. C007759. Third Dist. Dec. 30, 1991.]

HERBERT KRAFT WALTON, JR., Plaintiff, Cross-defendant and Appellant, v.
CITY OF RED BLUFF, Defendant, Cross-complainant and Appellant.

**COUNSEL**

Clyde Small for Plaintiff, Cross-defendant and Appellant.

Harold J. Lucas for Defendant, Cross-complainant and Appellant.

**OPINION**

**CARR, J.**—In 1908 and 1916 respectively, Mrs. Elizabeth Kraft and her son, Edward Kraft, granted to the City of Red Bluff certain properties to be used as a library. In 1986, the books were removed from the library building. Herbert Kraft Walton, a descendant and heir of the donors, filed suit seeking reconveyance of the property to him pursuant to the original grants which provided for reversion to the grantors or their heirs if the property ceased to be used for library purposes.

Red Bluff cross-complained, contending it owned the land free of any use restrictions. The trial court ruled the transfer was not in trust but on condition, that the condition was not triggered by temporary abandonment by Red Bluff and the condition was still valid. The trial court found the land could be used for a library or certain related purposes.

On appeal Walton urges the land was transferred by a trust instrument and, as the trust terms were violated, the land reverts to him as the successor of

the settlor. On cross-appeal Red Bluff urges the land was transferred in fee simple on condition subsequent, but the passage of time has nullified the purpose of the condition and it should be declared the owner in fee simple.

The transfer was by fee simple determinable, leaving the heirs of the grantors with a possibility of reverter, also called a right of entry or reentry. By statute such interests are now powers of termination. We requested supplemental briefing on the effect of the marketable record title statutes (Civ. Code, § 880.020 et seq.) on this case.[1] We conclude the issue of Walton's failure to record his claimed power of termination pursuant to the marketable record title statutes cannot be raised for the first time on appeal. On the undisputed facts below Red Bluff violated the condition of the grants. We shall reverse the judgment with directions to the trial court to quiet title in favor of Walton.

### FACTUAL AND PROCEDURAL BACKGROUND

The parties stipulated that trial by the court would be conducted on the pleadings, trial briefs and certain declarations submitted by Red Bluff to which Walton preserved objections.

Elizabeth and Edward Kraft, the wife and son of Herbert Kraft, wished to provide for a public library in Red Bluff. The library was to be free, open to all races, and dedicated to the memory of Herbert Kraft.[2] Each gave land for the library by inter vivos transfer and each left money for library purposes by bequests in their wills.[3] The Krafts transferred the land by separate but similar documents, denominated indentures, the pertinent provisions of which are recited in the appendix. It is not disputed that in September 1986, the books were removed from the library.

On February 18, 1988, Walton filed a complaint for declaratory relief, to terminate a trust, and to quiet title as against Red Bluff. The complaint

---

[1]Further unspecified references are to the Civil Code.

[2]Herbert Kraft was a prominent settler of Red Bluff (Elliott & Moore, Tehama County, California (1880) Herbert Kraft, pp. 148-149), and his business ventures figure in some early cases. (*Herbert Kraft Co.* v. *Bryan* (1903) 140 Cal. 73 [73 P. 745]; *Darrough* v. *Herbert Kraft Co. Bank* (1899) 125 Cal. 272 [57 P. 983].)

[3]Exhibit C to Red Bluff's exhibit A is the library agreement whereby Tehama County took over operation of the library effective July 1, 1962. The agreement makes reference to extracts of the wills of Elizabeth and Edward, who left $5,000 and $10,000 respectively in trust for the Herbert Kraft Fund. The bequests "cease and determine" if Red Bluff fails to appropriate money for the library (see *City of Hermosa Beach* v. *Superior Court* (1964) 231 Cal.App.2d 295, 299 [41 Cal.Rptr. 796]) "or if the said Library shall at any time be closed, except for temporary repair, to the free use of the public." It is not clear whether the trial court considered the terms of the wills in ruling on the indentures and as the money is not at issue in this case we will pass on the question.

alleged Walton was the sole surviving heir of Elizabeth and Edward (called by Walton "trustors"), who died in 1916 and 1920, respectively. Attached as exhibits to the complaint were the indentures.

Red Bluff answered, admitting the allegations of the complaint except for denying it held the property in violation of Walton's rights and denying Walton was entitled to possession or title. Red Bluff cross-complained for declaratory relief and to quiet title. Red Bluff alleged the books were moved to a new building because of a lack of space, the lack of access for handicapped and elderly persons and the lack of parking.[4]

The trial court issued a statement of decision in which the court stated the "indentures" were "not an attempt to create a trust in the classic sense." Citing two cases, discussed below, the court treated the conveyance as a grant in fee, subject to a condition, and found the condition of abandonment had not yet occurred.[5]

Judgment was entered that Red Bluff had not breached the "condition of conveyances," but its request to quiet title was denied and it was ordered that Red Bluff "does not have the right or the power to dispose of the property, or to use it otherwise than in accordance with this judgment. [¶] 4. It is further adjudged that [Red Bluff] must use the Kraft Building for library purposes, but is not restricted to that use alone, and may use said building consistent with the terms of the grant . . . ."

Both parties appeal. We shall reverse.

---

[4]The declarations established the following: Elizabeth Kraft paid construction costs. The population of Red Bluff was 3,522 in 1909 and 11,100 in 1986. Red Bluff and the County of Tehama merged their library functions and effective July 1, 1962, the county operated the library. Red Bluff intends "to continue to use the Kraft Building for public, educational, and entertainment purposes. . . . It is not possible . . . to give firm commitments . . . until title to the Kraft Building and types of permitted uses are ascertained by the Court. All such uses should be by non-profit organizations free to the public, or at nominal cost. . . ." The physical inadequacies of the Kraft building were detailed.

[5]The court found Red Bluff "is bound by the description of the use of the premises and must devote the use of the building for public purposes consistent with the conditions of the grant. Those conditions . . . are reasonably liberal and are not restricted to library purposes, . . . [¶] In other words, the County can carry some historical books in the library and use the balance of the building, if there is any space available, for all those matters implied in the [third paragraph of the grant]. [¶] The evidence further develops that it is not the intention of [Red Bluff] to cease use of the library building and property for public purposes consistent with the grant. [¶] The Court finds that [Red Bluff] has not breached the condition or has a consideration for this conveyance failed [sic] and that [Red Bluff] still owns the property subject to the conditions of the grant."

## DISCUSSION

The first determination is the nature of the grants made by the Krafts. We conclude the trial court correctly ruled no trust was created. Though Walton originally had a possibility of reverter, his interest was converted by statute into a power of termination. Next we consider the effect of Walton's failure to record his power of termination in compliance with the marketable Record Title statute and Red Bluff's failure to raise this issue below; we conclude Red Bluff's failure to raise this issue below operates as a waiver. As the agreed facts establish a breach of the condition of conveyance, we shall remand with directions to the trial court to quiet title to the library in Walton.

## I. THE NATURE OF THE GRANTS

### A. *No trust was created by the indentures at issue.*

 Walton has based his claim entirely on the existence of a trust.[6] The trial court found no trust was created by the indentures, a finding with which we agree.

Elizabeth Kraft's indenture provides the grantor "does hereby give, grant and convey" the property "To have and to hold the said premises in trust for the uses and purposes of a public library. No portion of said property shall be used for any other purpose[.]" "If the property herein conveyed shall at any time, be abandoned by the said Town of Red Bluff, or if the said property shall cease to be used, for library purposes, by said Town, or shall be put to [any] use other [than] the uses and purposes, herein specifically referred to . . . then the grant and conveyance herein made shall cease and terminate, and the title to the said property and all the improvements thereon shall at once revert to the party of the first part or to her heirs or assigns."

Edward Kraft's indenture refers to "further carrying out the ideas of his Mother in making the gift above mentioned . . . the said party of the first part does hereby give, grant and convey" additional property "To HAVE AND TO HOLD the said premises in trust for the uses and purposes of the [Herbert Kraft Free Public Library] on the same terms and conditions and for the same purposes and uses that the rest of said Library property is held, the same being . . . [incorporating the restrictions contained in his mother's indenture]."

---

[6]Walton's brief does not comply with California Rules of Court, rule 15(a), in that it does not separately head his legal arguments. Instead, his brief contains the heading "Appellant's Legal Contentions," followed by four pages of disjointed points. (*In re David L.* (1991) 234 Cal.App.3d 1655 [286 Cal.Rptr. 398] [court may disregard issues not properly headed].)

As the court took no extrinsic evidence on the meaning of the documents, we exercise our independent judgment in this review. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)[7] ■ In general, a grant of real property is interpreted in like manner as a contract: The grant is interpreted in favor of the grantee; any reservations are interpreted in favor of the grantor. (§§ 1066, 1069; *Machado* v. *Southern Pacific Transportation Co.* (1991) 233 Cal.App.3d 347, 352-353 [284 Cal.Rptr. 560]; *Concord & Bay Point Land Co.* v. *City of Concord* (1991) 229 Cal.App.3d 289, 294 [280 Cal.Rptr. 623].) "If the operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction." (§ 1068.)

■ A reverter is a type of forfeiture, abhorrent to the law. (§ 1442; Simes, *Restricting Land Use in Cal. by Rights of Entry and Possibilities of Reverter* (1962) 13 Hastings L.J. 293, 298-301 [noting techniques used to avoid permitting reverter].) Because "the law views reversion as an anomalous doctrine, an exception to the general aversion to forfeiture" "the law requires clear expression of the grantor's intent." (*Springmeyer* v. *City of South Lake Tahoe* (1982) 132 Cal.App.3d 375, 379-380 [183 Cal.Rptr. 43]. See *Fitzgerald* v. *County of Modoc* (1913) 164 Cal. 493, 495 [129 P. 794].) Language like that in the Walton deeds, including use of the word "revert," evidences such intent. (*Fitzgerald* v. *County of Modoc, supra*, 164 Cal. at pp. 495-496.)

■ The use of the word "trust" in a grant does not without more make a trust.[8] To constitute a trust there must be trust intent, trust property, trust purpose and a beneficiary. (Prob. Code, §§ 15201-15205 [applicable to all trusts as of July 1, 1987, and trust proceedings begun on or after that date]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Trusts, § 27, p. 912.) The intention to create a trust must be shown by more than an expression of intent to establish a moral obligation: "The problem is one of construction, but ordinarily words of *desire*, hope or recommendation that a *devisee* or *legatee* use the property given him for the benefit of another do not create a trust. The direction must be imperative. [Citations.]" (*Id.* at § 34, p. 919.)

---

[7]The evidence taken regarding the closure of the library is not relevant to the meaning of the documents.

[8]Other states applying trust principles similar to those of California have so held in factual situations akin to the instant case. In *Connecticut Junior Republic Ass'n* v. *Litchfield* (1934) 119 Conn. 106 [174 A. 304, 95 A.L.R. 56, 62] the deed conveyed property "in trust, . . . as long as [the grantee] shall continue its existence for the uses . . . outlined . . . but if at any time it shall fail to so use said property . . . then the property . . . shall revert"; held, fee simple determinable, not a trust. In *Fayette County Board of Educ.* v. *Bryan* (1936) 263 Ky. 61 [91 S.W.2d 990, 991-992], the property was deeded "in the trust forever" for school purposes, but if used otherwise it "shall revert"; held defeasible or determinable fee.

"An interest subject to a condition subsequent is not, because of the condition, held in trust." (Rest.2d Trusts, § 11, p. 32.) "The owner of property may transfer it, inter vivos or by will, to another person and provide that if the latter should fail to perform a specified act his interest should be forfeited. In such a case the interest of the transferee is subject to a condition subsequent and is not held in trust." (*Id.* at § 11, com. a, p. 32.) Further, "Where the owner of property transfers it inter vivos or by will 'upon condition' that it be dealt with in a manner beneficial to a third person, a trust is created if the transferor manifested an intention that the transferee should be subject to a duty to use it for the benefit of such third person, rather than that he should be divested of his interest if he should fail to perform the specified act." (*Id.* at § 11, com. c, p. 33.) ██ Here the document evidences an intent to divest the transferee of its interest if it fails to maintain a library, indicating no trust was intended.[9]

In the instant case "the grant and conveyance herein made shall cease and terminate, and the title to the said property . . . shall at once revert to the party of the first part or to her heirs or assigns." This is the language of a fee grant, not a trust. (*Mareck, supra,* 100 N.W.2d at p. 762. See also *Abboud, supra,* 391 N.W.2d at p. 580; *Moore* v. *Wells* (1956) 212 Ga. 446 [93 S.E.2d 731, 736] [upon cessation of use for school purposes property "shall revert"; no trust created]; 4A Scott on Trusts (4th ed. 1989) Charitable Trusts, § 351, pp. 52-53; 4 Bogert, The Law of Trusts & Trustees (rev. 2d ed. 1977) Creation, § 324, pp. 561-563.) The use of the word "trust" was precatory, intended to convey to the recipient the solemnity of the grant.

██ Walton urges Red Bluff cannot deny the existence of a trust as it did not deny allegations in the complaint which refer to a "trust." The complaint

---

[9]In *Application of Mareck* (1960) 257 Minn. 222 [100 N.W.2d 758], a grant was made " 'in trust, nevertheless, to have, hold, administer and maintain the same as a public park; . . . and if said land shall cease to be a public park . . . the title thereto shall revert to the above named grantor, . . . his heirs or assigns.' " (100 N.W.2d at p. 760.) The court held the grant was in fee: "[W]hile the grantor did use language consistent with the creation of a charitable trust, he also provided that the title should revert to him if the property ceased to be used for a public park [or on certain misuses of the property]. It is thus apparent that the reversion clause came into being for reasons other than mere abandonment of the property for park purposes. . . . A possibility of reverter is one of the common characteristics of a terminable fee." (*Id.* at p. 763, fn. omitted.) *Mareck* was followed in *Abboud* v. *Lakeview, Inc.* (1986) 223 Neb. 568 [391 N.W.2d 575]: "Because intent and res are the basic elements of a valid trust, any residual right in the grantor, such as a right of reentry, is inconsistent with the intent to create a public trust in perpetuity: ' "[W]here it clearly appears that the [grantor] intends that the *res* shall revert to himself or his heirs if the charitable purpose is not served, the devise is not a charitable trust, but is construed as some type of absolute or conditioned gift." ' [*In re Application of Mareck to Register Title,* [100 N.W.2d 758, 762 (1960)]. In *Mareck* the deed actually contained the word 'trust,' but because of the words of reversion, the court construed the grant as a fee simple condition subsequent. See, also, Restatement (Second) of Trusts § 11, comment a. . . ." (391 N.W.2d at p. 580.)

is captioned "Complaint to Declare Termination of Trust and Compel Delivery of Real Property, to Quiet Title and for Declaratory and Other Relief." However, the only paragraph specifically referring to a "trust" merely tracked the language of the indentures by noting the property was "to be held in trust and utilized solely for library purposes." Whether the indentures created a trust was a legal conclusion and Red Bluff's denial of any right of Walton to possess or hold title to the property was sufficient to put the nature of Walton's interest in issue. (*Kidwell* v. *Ketler* (1905) 146 Cal. 12, 17-18 [79 P. 514] [terms of will set out in complaint, allegation of trust not denied, allegation not deemed admitted as it was a conclusion of law]; *Bussenius* v. *Warden* (1925) 71 Cal.App. 717, 718-719 [236 P. 371]. Cf. Code Civ. Proc., § 431.20, subd. (a) [facts deemed admitted if not denied].)

### B. *The interest of Walton is now a power of termination.*

 Either a fee simple determinable or a fee simple on condition subsequent was created by the indentures herein. The former ends upon the happening of a stated condition, resulting in a reverter, while the latter gives the grantor or successor the power of termination over the fee, often called a right of reentry. (5 Miller & Starr, Current Law of Cal. Real Estate (2d ed. 1989) Estates, §§ 11:5-11:6, pp. 8-11.)

The language of the grant suggests a fee simple determinable was created.[10] This construction of a grant is disfavored (*Mountain Brow Lodge, I.O.O.F.* v. *Toscano* (1967) 257 Cal.App.2d 22, 25, fn. 2 [64 Cal.Rptr. 816]), but will be adopted to effectuate the intent of the grantor. (*McDougall* v. *Palo Alto etc. School Dist.* (1963) 212 Cal.App.2d 422, 433-435 [28 Cal.Rptr. 37]. See *First Universalist Society* v. *Boland* (1892) 155 Mass. 171 [29 N.E. 524] ["the estate would cease and determine by its own limitation"].) Use of a "cease and terminate" clause evidences a fee simple determinable, as does the phrase "shall at once revert."

The trial court treated Walton's interest under the grants as a power of termination. Irrespective of the accuracy of this characterization from a reading of the indentures, the trial court was correct in its assessment for a different reason.

Section 885.020, enacted in 1982, provides: "Fees simple determinable and possibilities of reverter are abolished. Every estate that would be at

---

[10] But see Turrentine, *Suggestions for Revision of Provisions of the California Civil Code Regarding Future Interests* (1932) 21 Cal.L.Rev. 1, 5-6, questioning existence of reverters in California; Ferrier, *Determinable Fees and Fees Upon Conditions Subsequent in California* (1936) 24 Cal.L.Rev. 512, 523. In *Springmeyer* v. *City of South Lake Tahoe, supra,* 132 Cal.App.3d at page 380, footnote 3, we noted the paucity of authority for the existence of reverters in this state.

common law a fee simple determinable is deemed to be a fee simple subject to a restriction in the form of a condition subsequent. Every interest that would be at common law a possibility of reverter is deemed to be and is enforceable as a power of termination." (Stats. 1982, ch. 1268, § 1, p. 4678.) Walton's interest was a power of termination. Such a power must be exercised: Instead of an immediate right to the property, Walton had to reenter. (See 5 Miller & Starr, *op. cit. supra*, § 11:8, pp. 13-14.)

Walton makes an undeveloped argument that the conversion of his interest into a right of reentry following a fee simple on condition subsequent violates due process: "The provision is declared to be retrospective, subject to a grace period . . . . [¶] Due process questions are thus raised which cannot be briefed in the prescribed time frame. [¶] Could the Legislature, for example, enact that estates in fee simple will be 'deemed' to be tenancies at will, or licenses to enter, after five years?" Walton misconstrues the import of the statute. Walton's possibility of reverter was not abolished; it was transformed into a power of termination. Walton does not explain how this has harmed him. As the Law Review Commission explained, the two are essentially the same. "The possibility of reverter is an unnecessary estate in property law. It serves the same functions as the right of entry and there is no practical difference of any substance between the two." (Recommendations Relating to Marketable Title of Real Property (Nov. 1981) 16 Cal. Law Revision Com. Rep. p. 416. See Cal. Law Revision Com. com., Deering's Ann. Civ. Code, § 885.020 (1990) p. 111.) Walton does not articulate how his interest has been harmed by what is essentially a name change; we therefore reject his contention.

## II. THE MARKETABLE RECORD TITLE STATUTE

### A.

In 1982 the Legislature passed a comprehensive statute designed "to simplify and facilitate real property title transactions in furtherance of public policy by enabling persons to rely on record title . . . . This title shall be liberally construed to effect the legislative purpose." (§ 880.020, subd. (b).) The public policy declared by the Legislature is that realty is a basic resource which should be freely alienable (§ 880.020, subd. (a)(1)), "Interests in real property and defects in titles created at remote times, whether or not of record, often constitute unreasonable restraints on alienation and marketability . . . ." (§ 880.020, subd. (a)(2)), these remote interests foment litigation to quiet title and accurate title "should be determinable to the extent practicable from an examination of recent records only." (§ 880.020, subd. (a)(4).)

To achieve these goals, the Legislature adopted a recordation requirement for certain types of interests, including powers of termination. (§ 885.010 et seq.) Failure to record interests within a given period of time results in expiration of the interest. These times for expiration "are absolute and apply notwithstanding any disability or lack of knowledge of any person . . . ." (§ 880.250, subd. (a).)

An interest may be preserved by the timely recordation of a notice of intent to preserve the interest and these notices may be given consecutively: Perpetuity of interest is not prohibited. (Cal. Law Revision Com. com., Deering's Ann. Civ. Code, § 880.310 (1990) p. 88.) Any person who claims an interest may record the notice, a form of which is provided in the statute. (§§ 880.320, 880.340.)

If the period to record the notice expires within five years after the operative date of the statute, the period is extended until five years after the operative date. (§ 880.370.) A power of termination expires at the later of: (1) 30 years after recordation of the instrument evidencing the power; (2) 30 years after recordation of the last notice of intent to preserve the power.[11] (§ 885.030.)

"An interest . . . does not expire . . . and is not unenforceable pursuant to this title at the time prescribed in this title if within the time an action is commenced to enforce . . . the interest and a notice of the pendency of the action is recorded as provided by law." (§ 880.260.) "A power of termination shall be exercised only by notice or by civil action and, if the power of termination is of record, the exercise shall be of record." (§ 885.050.) Here the power of termination was exercised by civil action commenced in February 1988. The action was not filed timely.

Since the 30-year period for recordation of intent to preserve the power would have expired long before the passage of the statute, Walton was entitled to the 5-year grace period provided by section 880.370. The statute was passed in 1982. (Stats. 1982, ch. 1268, § 1, p. 4671.) The operative date of the statute was January 1, 1983. (Gov. Code, § 9600, subd. (a).) Thus Walton (and all such holders of powers of termination) had until January 1, 1988, to record a notice of intent to preserve the interest or to exercise the power. (10 Hagman & Maxwell, Cal. Real Estate Law & Practice (1991) Estates in Real Property, § 340.62[5], p. 340-61.) As noted, Walton did not

---

[11]A power of termination also expires when it becomes "obsolete" (§ 885.040), an issue discussed, *post.*

exercise the power until he filed suit in February 1988, after the power had expired.[12]

Section 885.060 provides in part: "(a) Expiration of a power of termination . . . makes the power unenforceable and is equivalent for all purposes to a termination of the power of record and a quitclaim of the power to the owner of the fee simple estate, and execution and recording of a termination and quitclaim is not necessary to terminate or evidence the termination of the power. [¶] (b) Expiration of a power of termination pursuant to this chapter terminates the restriction to which the fee simple estate is subject and makes the restriction unenforceable by any other means, including, but not limited to, injunction and damages."

Walton brought suit on an unenforceable power of termination. As neither party discussed this point below or on appeal we requested supplemental briefing on this issue.

Walton's supplemental brief makes the preliminary points that (1) this court is bound by the issues as presented by the parties, (2) this court did not afford him sufficient time to brief the issue and (3) "Unless this court is prepared to subordinate equitable principles which have been accepted for 500 years . . . to effectuate the vague and suspect objective of lubricating a wide and unrelated congeries of transactions which would be benefitted by 'mark[et]able title', the sections should not be considered in this case."

We quickly dispose of the first two points. ■ An appellate court has the power to raise issues on its own motion. (E.g., *County of Colusa* v. *Charter* (1989) 208 Cal.App.3d 256, 259, 261 [256 Cal.Rptr. 45] [supplemental briefing on statute not considered at trial; statute material to disposition of appeal]; *Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 826 [164 Cal.Rptr. 264] & fn. 8 [supplemental briefing on whether complaint stated a cause of action].) Government Code section 68081 expressly provides a reviewing court must grant rehearing if it decides an appeal on an issue not briefed by the parties unless it affords an opportunity for further briefing. "How can [an appellate justice] be sure that between counsel's efforts and his own all pertinent materials have been rounded up? Suppose there lies undiscovered some pertinent statute still at large? Many a judge is

---

[12]Exhibit C to the complaint is a letter from Walton's attorney to Red Bluff's attorney, dated January 29, 1987. It refers to the library "trust" and states "since the use for which the property was entrusted has been discontinued, it appears to be in order for the city to reconvey the property to Mr. Walton, who is the heir of the trustor." The letter invites negotiations. It does not meet the requirements of an exercise of a power of termination as it was not recorded. (§ 885.050. See 4 Witkin, Summary of Cal. Law (1987) Real Property, § 14, subd. (6), p. 230; 5 Miller & Starr, *op. cit. supra*, p. 16.)

haunted by the muddle that ensues when a court overlooks such a statute even when it is in plain sight." (R. Traynor, *Badlands in an Appellate Judge's Realm of Reason* (1960) 7 Utah L.Rev. 157, 159-160.) "Too often both sides set forth issues that float upon the surface of a problem and yield no clue to the ones beneath. An element of chance then enters the solution, for even the most painstaking court may fail to uncover what the adversaries failed to reveal. [¶] . . . When [a court] must itself formulate the issues it then gives counsel an opportunity to submit new briefs, which they should not lightly disregard." (*Id.* at p. 159. See Witkin, Manual on Appellate Court Opinions (1977) Special Problems of Appellate Review, § 85, pp. 154-155.) We provided Red Bluff and Walton 20 days in which to file their supplemental briefs. Walton cannot now complain of a lack of time to brief this issue properly as he did not ask for an extension of time.

The third preliminary point urged by Walton is irrelevant. We do not decide whether the objectives of a statute are good or bad as that is a matter "properly resolved on the other side of Tenth Street, in the halls of the Legislature." (*Osborn* v. *Hertz Corp.* (1988) 205 Cal.App.3d 703, 711 [252 Cal.Rptr. 613].)[13]

## B.

Walton urges substantively that Red Bluff's failure to raise in the trial court the issue of failure to record under the marketable record title statutes precludes consideration of that issue on appeal. Whether Red Bluff is precluded from raising the issue on appeal depends on whether compliance with the statute is a part of Walton's cause of action, which requires an allegation that the statute has been satisfied. "If the party against whom a complaint or a cross-complaint has been filed fails to object to the pleading, either by demurrer or answer, that party is deemed to have waived the objection unless it is . . . an objection that the pleading does not state facts sufficient to constitute a cause of action." (Code Civ. Proc., § 430.80, subd. (a); *Buford* v. *State of California, supra,* 104 Cal.App.3d at p. 826; 5 Witkin, Cal. Procedure, *supra,* Pleading, § 908, p. 346.)

If compliance with the record title act is part of a cause of action for enforcement of a power of termination, Red Bluff's failure to demur is irrelevant. If lack of such compliance is in the nature of an affirmative defense, Red Bluff's failure to raise the issue below constitutes a waiver of that issue and bars consideration of the issue on appeal. Though the statutory scheme renders Walton's interest "expired" and "unenforceable," the statute

---

[13]We note, however, that this comprehensive statute was the product of years of research by the Law Revision Commission. (Recommendations Relating to Marketable Title of Real Property, *supra,* 16 Cal. Law Revision Com. Rep., at p. 403.)

at issue does not state which party has the burden of pleading this point. Nowhere in this statute is there any requirement that a party plead compliance in order to maintain suit.

We do not perceive the statute in question as one which extinguishes the right of an owner of a reversionary interest, or what is now termed a right of reentry or a power of termination. Therefore, pleading compliance with the statute is not required as such compliance is not an element of the cause of action to reenter property or quiet title thereto.

This statute was the product of years of research and debate. It adds a comprehensive set of rules for the preservation of interests in ancient mortgages, mineral rights, unexercised options, powers of termination, unperformed land-sale contracts and abandoned easements. Nowhere in the statute or even the Law Revision Commission notes is there any mention of a pleading requirement. (But see Cal. Law Revision Com. com., Deering's Ann. Civ. Code, § 880.250 (1990) p. 85 [no off-record waivers].) This simple device could easily have been adopted to ensure any holder would be required to plead and prove compliance with the statute. It was not. Nor did the Legislature see fit to amend Code of Civil Procedure section 761.020, which sets forth the elements of a quiet title action, a normal method of exercising a power of termination.[14] (See *Thornton* v. *Middletown E. Corp.* (1937) 21 Cal.App.2d 707, 710 [70 P.2d 234].) Had the Legislature intended the burden to be on the claimant it could have so provided. The normal method of challenging a claim as unenforceable is by pleading an affirmative defense.[15]

In analogous cases where a claim is unenforceable the burden is on the defense to demonstrate unenforceability. When a claim is barred by the statute of limitations the issue must be pleaded as an affirmative defense. (3 Witkin, Cal. Procedure (1985) Actions, § 314, p. 345.) Other claims of unenforceability must be raised by affirmative defense, such as a claim a contract is barred by the statute of frauds (*Howard* v. *Adams* (1940) 16 Cal.2d 253, 257 [105 P.2d 971, 130 A.L.R. 1003] [waiver at trial by failure to object]), res judicata (*Dillard* v. *McKnight* (1949) 34 Cal.2d 209, 219 [209 P.2d 387, 11 A.L.R.2d 835] [same]), release (*Hildebrand* v. *Stonecrest Corp.* (1959) 174 Cal.App.2d 158, 165 [344 P.2d 378]), or accord and satisfaction (*Owens* v. *Noble* (1946) 77 Cal.App.2d 209, 215 [175 P.2d 241]).

---

[14]That section requires, inter alia, the verification of a complaint to quiet title, a requirement not met in this case.

[15]At least one practice manual supplies a form for pleading as an affirmative defense a plaintiff's lack of compliance with the statute. (4A Cal. Forms of Pleading & Practice Annot. (Matthew Bender 1991) Deeds, Form No. 39, pp. 156-157.)

Finally, we ordinarily construe statutes to avoid doubts about their constitutionality. (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 60 [195 P.2d 1]; *Shealor* v. *City of Lodi* (1944) 23 Cal.2d 647, 653 [145 P.2d 574].) As we explained, *ante*, Walton has not made out a due process violation by the conversion of his interest into a power of termination. The requirement that a holder of a reversionary interest file a notice of intent to preserve that interest creates a minimal burden: once each 30 years he or she must record a form document. The benefit to the state is great in that marketability of title is improved. (§ 880.020. See *Wichelman* v. *Messner* (1957) 250 Minn. 88 [83 N.W.2d 800, 825, 71 A.L.R.2d 816], discussed in Basye, Clearing Land Titles (2d ed. 1970) § 175, p. 385.) Federal precedents suggest this statute does not violate due process on that ground. The United States Supreme Court has upheld legislation providing but a two-year grace period for recordation of a claim. (*Texaco, Inc.* v. *Short* (1982) 454 U.S. 516 [70 L.Ed.2d 738, 102 S.Ct. 781] [upholding the Indiana Dormant Mineral Interests Act].) "We have no doubt that, just as a State may create a property interest that is entitled to constitutional protection, the State has the power to condition the permanent retention of that property right on the performance of reasonable conditions that indicate a present intention to retain the interest." (*Id.* at p. 526 [70 L.Ed.2d at pp. 748-749]. See also *United States* v. *Locke* (1985) 471 U.S. 84, 104 [85 L.Ed.2d 64, 82, 105 S.Ct. 1785], in which the court held "As long as the constraint or duty imposed is a reasonable restriction designed to further legitimate legislative objectives, the legislature acts within its powers in imposing such new constraints or duties. [Citations.]" [upholding similar federal law requiring, inter alia, annual filing of claims].)

Marketable title acts in various forms have been enacted in other states. In some, absolute limits are set on the duration of certain interests; others abolish certain interests completely. Those like the California statute require periodic recording of some interests. (See generally, 6a Powell on Real Property (1991 rev.) Recording Acts and Priorities, ¶ 907[2][b], pp. 82:103-108.) New York has held such a latter statute unconstitutional on the theory it impairs contractual obligations. (*Board of Education of Central Sch. Dist. No. 1* v. *Miles* (1965) 15 N.Y.2d 364 [259 N.Y.S.2d 129, 207 N.E.2d 181].) Other courts disagree. (*Cline* v. *Johnson County Bd. of Education* (Ky. 1977) 548 S.W.2d 507 [87 A.L.R.3d 1007]; *Presbytery of Southeast Iowa* v. *Harris* (Iowa 1975) [226 N.W.2d 232]; *Lane* v. *Travelers Ins. Co. of Hartford, Conn.* (1941) 230 Iowa 973 [299 N.W. 553]. See *Bennett* v. *Whitehouse* (W.D.Okla. 1988) 690 F.Supp. 955 [applying Oklahoma law]; *Mobbs* v. *City of Lehigh* (Okla. 1982) 655 P. 2d 547 [31 A.L.R.4th 1] [assuming constitutionality]. See Basye, Clearing Land Titles, *supra*, §§ 143, 175, pp. 326-327, 384-385.)

The California statute provides for no notice of the recordation requirement, other than the legal fiction that all persons are presumed to know the law. While that fiction may suffice in some cases, it is arguably not enough in this case. In *Texaco, Inc.* v. *Short, supra*, the statute penalized the owner for the failure to use a mining claim for 20 years and failing to record a notice within two years after the effective date of the Indiana recording statute. (454 U.S. at p. 521 [70 L.Ed.2d at pp. 745-746].) The court noted that "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." (*Id.* at p. 532 [70 L.Ed.2d at p. 752].) However, a mining claim is quite different from a reversionary interest. It is meant to be used. It is also important to note the strong dissent by four members of the *Texaco* court:

"[W]e have recognized certain very limited circumstances in which a State's reliance on the maxim that a man may be presumed to know the law is not consistent with the restrictions imposed by the Constitution on legislative action. . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . The State's power to impose sanctions on individuals is to be tested in part against the rationality of the proposition that those individuals were or could have been aware of their legal obligations. The present cases, like [*Lambert* v. *California* (1957) 355 U.S. 225 [2 L.Ed.2d 228]], involve the necessity of notice in the context of a registration statute sufficiently unusual in character, and triggered in circumstances so commonplace, that an average citizen would have no reason to regard the triggering event as calling for a heightened awareness of one's legal obligations.

". . . The Court would appear to treat property owners as businessmen, of whom we do indeed expect the greatest attentiveness to regulatory obligations in the conduct of their business affairs. But neither our cases nor our experience supports the Court's supposition about the diligence reasonably expected of property owners. Property owners have historically been allowed to rest easy in the knowledge that their holding is secure, absent some affirmative indication to the contrary; . . . Surely no contrary understanding of the obligations of property ownership could be attributed to the mineral interest owners of Indiana. It was their historic complacency, heretofore undisturbed by statutory obligation, that prompted the State of Indiana to install the regulatory regime at issue here." (454 U.S. at pp. 545-548 [70 L.Ed.2d at pp. 761-763].)

A holder of a reversionary interest is even less like a businessperson than the holder of a mining claim. The effectiveness of the notice provided by the

state is best illustrated by the fact that not only did Walton not know of the requirement, his attorney, Red Bluff, and Red Bluff's attorney were equally unaware of the statutes.[16]

As between the two owners, Red Bluff, as the owner of the major interest in the property and the possessor of the property, should bear the consequences of ignorance of the law. Red Bluff's failure to raise the recording issue below precludes consideration of the issue here.[17]

### III. ABANDONMENT

■ Based on the undisputed facts before the trial court Red Bluff violated the express condition of the grant that unless the property be used for "uses and purposes of a public library," the property should be returned to the Kraft family.

The grants provide in part: "If the property herein conveyed shall at any time, be abandoned by the said Town of Red Bluff, . . . or if the said property shall cease to be used, for library purposes, by said Town, . . . or shall be put to [any] use other [than] the uses and purposes herein specifically referred to, . . . then the grant and conveyance herein made shall cease and terminate, and the title to the said property and all the improvements thereon shall at once revert to the party of the first part, or to her heirs or assigns."

Red Bluff admits all the books were removed from the library as of September 1986. The trial court framed the issue as one of abandonment. But the grantors specified that "if the said property shall cease to be used, for library purposes" the grants terminate. There is no question but that the property is no longer used for library purposes. The trial court stated *Savanna School Dist.* v. *McLeod* (1955) 137 Cal.App.2d 491 [290 P.2d 593] and *Hasman* v. *Union High School* (1926) 76 Cal.App. 629 [245 P. 464] were "pertinent" to its decision. In each case, the grant required the grantee to build and maintain a school, or the land would revert: In each case, a school was built and used for a period of time, satisfying the condition of the grant. In this case the grant required continued operation of a library. The "condition" here is distinguishable. Further, the construction of the condition that a grantee "maintain" a school as requiring such maintenance for a limited time only was disapproved in *Rosecrans* v. *Pacific Elec. Ry. Co.* (1943) 21 Cal.2d

---

[16]As noted above (fn. 12, *ante*, at p. 129), Walton's attorney informally sought reconveyance of the property. Red Bluff's duty to reconvey arose on breach of the condition. (§ 1109; *Lincoln* v. *Narom Development Co.* (1970) 10 Cal.App.3d 619, 624 [89 Cal.Rptr. 128].)

[17]As a determination of the constitutionality of the statute is unnecessary to our decision, we express no opinion on that issue but note that there are proper concerns of notice.

602, 604, 606-608 [134 P.2d 245]. Though *Savanna* notes *Hasman* was "commented upon" in *Rosecrans* it relied on the failure of *Rosecrans* to overrule *Hasman* as evidence of that case's continued vitality. (*Savanna*, *supra*, 137 Cal.App.2d at p. 494.) *Rosecrans* found the reasoning in *Hasman* "doubtful" and "not clear" and distinguished it on the ground the grant at issue in *Rosecrans* contained an express requirement of continued compliance with the condition. (*Rosecrans*, *supra*, 21 Cal.2d at p. 608.) As the Kraft grants expressly require continued operation of the library, *Hasman* and *Savanna*, even if good law on their particular facts, are distinguishable.

Whether Red Bluff intended to "abandon" the use purpose of the property or not, it removed the books and stopped using the premises for library purposes. (See *Concord & Bay Point Land Co.*, *supra*, 229 Cal.App.3d at pp. 297-298 [statute of limitations on exercise of power began running when railroad tracks removed].) The grants defined library purposes broadly to include various educational endeavors, but there is no evidence any of these other activities took place. (See e.g., *Save the Welwood Murray Memorial Library Com.* v. *City Council* (1989) 215 Cal.App.3d 1003, 1012-1016 [263 Cal.Rptr. 896] [requiring strict compliance with restriction in deed which did not define library purposes, finding no evidence proposed use was permitted]; *Richey* v. *Corralitos U. School Dist.* (1924) 67 Cal.App. 708, 709-710 [228 P. 348].) Indeed, the evidence is to the contrary, as Red Bluff urged it was unable to use the library building due to the pending litigation. It stopped using the grant for library purposes and the property must go back to the Kraft heir.[18]

At oral argument Red Bluff focussed on the "changed conditions" doctrine. Section 885.040 provides that a power of termination expires when it becomes "obsolete" and states in part that a power of termination is obsolete when it would be "inequitable to enforce the power because of changed conditions or circumstances." (§ 885.040, subd. (b)(3).) This codifies prior law. (*Letteau* v. *Ellis* (1932) 122 Cal.App. 584, 588 [10 P.2d 496] [right of reentry may be lost if neighborhood conditions change]; Recommendations Relating to Marketable Title of Real Property, *supra*, 16 Cal. Law Revision Com. Rep., at p. 444.) In a leading case involving a covenant restricting the use of lots to residential purposes it was said that "where there has been a change in the uses to which the property in the neighborhood is being put, so

---

[18]In his brief and at oral argument, counsel for Red Bluff urged that the present uses of the building were within the library grant (that "The Kraft building is now leased, at no cost, to the Tehama County Literacy Council, a nonprofit corporation. The Council teaches reading skills to illiterate adults. This is done in conjunction with the Tehama County Library. These students are referrals from the 'Immigration Program; G.A.I.N. (welfare)' and individuals seeking reading assistance. There are approximately 120 students and 55 tutors in the program any given day.") These are only unsupported assertions of counsel. The record is barren and exhibits are barren of any such uses of the Kraft building.

that such property is no longer residence property, it would be unjust, oppressive, and inequitable to give effect to the restrictions, if such change has resulted from causes other than their breach." (*Downs* v. *Kroeger* (1927) 200 Cal. 743, 747 [254 P. 1101]. See also *Hess* v. *Country Club Park* (1931) 213 Cal. 613, 618-629 [2 P.2d 782]; *Hurd* v. *Albert* (1931) 214 Cal. 15, 22-23 [3 P.2d 545, 76 A.L.R. 1348].) In this case the alleged change in circumstance is that Red Bluff needs a bigger, modern library building, not that that present building cannot be used for the purposes of the grant or that the use of surrounding property makes operation of a library impracticable. Neither of the cases mentioned at oral argument support Red Bluff's position. (*MacDonald Properties, Inc.* v. *Bel-Air Country Club* (1977) 72 Cal.App.3d 693 [140 Cal.Rptr. 367] [treating the right of reentry as an equitable servitude, golf course sold border land subject to missed balls, buyer knew of restrictions on this land, no changed circumstances]; *Townsend* v. *Allen* (1952) 114 Cal.App.2d 291, 300 [250 P.2d 292, 39 A.L.R.2d 1108] [condition that liquor not be sold, et cetera, grantor sold other lots without conditions and the use of surrounding lands had changed, conditions waived].) In this case Red Bluff has had the use of the property for many years and simply chose to stop using it for the purposes for which it had agreed to accept the property. In these circumstances there is nothing inequitable about enforcing the restriction in the grant.

### DISPOSITION

The judgment is reversed with directions to the trial court to enter a judgment quieting title in favor of Walton. Costs to Walton.

Puglia, P. J., and Davis, J., concurred.

The petition of appellant City of Red Bluff for review by the Supreme Court was denied March 19, 1992.

APPENDIX

Elizabeth Kraft's document reads in part as follows:

"This indenture made this 27th day of November, 1908, between Elizabeth Kraft . . . the party of the first part, and the City (or town) of Red Bluff . . . party of the second part, WITNESSETH: That the party of the first part, does hereby give, grant and convey unto the party of the second part, all of that certain real property, situate in the Town of Red Bluff . . . described . . . as lots numbered 1, 2, 3, and 4, in Block 47.

"To have and to hold the said premises in trust for the uses and purposes of a public library. No portion of said property shall be used for any other purpose[.] The grounds shall not be conveyed or otherwise disposed of, but shall be retained by [Red Bluff] for such uses and purposes, as shall be deemed proper in connection with said library.

"The building or buildings that [are] now or shall hereafter be [constructed] on the said premises shall be used exclusively for library purposes. But by this grant it is not intended to restrict such use so that the term library or library purposes [shall] be understood to be used in a narrow or restrictive sense, but in its broadest terms, so as to include the use of said property . . . only for books, but for statuary, paintings and all other purposes, consistent with its use, for the purpose of which this grant is made, as above stated. Any portion . . . may be used for library schools, or lectures or other entertainment[s] conducted for the benefit of the library which shall be maintained on the said premises.

"The building[s and the books and other things therein] shall forever be known . . . as the 'Herbert Kraft Free Public Library' and shall at all time during reasonable hours be kept open for the free use of the public, under such reasonable regulations, as shall be from time to time made . . . but there shall be no restriction of any kind, based on racial lines, color, or religion.

" . . . . . . . . . . . . . . . . . . . . . . . .

"If the property herein conveyed shall at any time, be abandoned by the said Town of Red Bluff, or if the said property shall cease to be used, for library purposes, by said Town, or shall be put to [any] use other [than] the uses and purposes, herein specifically referred to, or, if the library shall at any time be placed or attempted to be placed upon any basis, other than for the free use, and benefit of the inhabitants of the town, and such other

persons as may . . . be given the right to use the same, or if [Red Bluff] shall make any conveyance of the said premises or any portion thereof, of if any attempt shall be made [to change the name], then the grant and conveyance herein made shall cease and terminate, and the title to the said property and all the improvements thereon shall at once revert to the party of the first part or to her heirs or assigns."

Edward Kraft's document reads in part:

"THIS INDENTURE, made this 17th day of July, 1916, between EDWARD F. KRAFT . . . the party of the first part, and the CITY OF RED BLUFF . . . the party of the second part,-

"WITNESSETH: That whereas, formerly, Elizabeth Kraft, Mother of the party of the first part herein . . . conveyed unto said City of Red Bluff Lots One, Two, Three and Four, of Block Forty-seven, of said City, with the building thereon, for a Public Free Library,

"NOW, further carrying out the ideas of his Mother in making the gift above mentioned . . . the said party of the first part does hereby give, grant and convey unto the said party of the second part, [Lot Five and part of Lot 6 of Block Forty-seven].

"To HAVE AND TO HOLD the said premises in trust for the uses and purposes of the [Herbert Kraft Free Public Library] on the same terms and conditions and for the same purposes and uses that the rest of said Library property is held, the same being . . . [incorporating the restrictions contained in his mother's indenture]."