[No. B204015. Second Dist., Div. Three. May 25, 2010.]

ALAN LADD, JR., et al., Plaintiffs and Appellants, v.
WARNER BROS. ENTERTAINMENT, INC., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for partial publication. The portion of this opinion to be deleted from publication is enclosed within double brackets, [[ ]].

## COUNSEL

Greenberg Traurig, Stroock & Stroock & Lavan, John M. Gatti, John J. Lucas; Greines, Martin, Stein & Richland, Robert A. Olson and Edward L. Xanders for Plaintiffs and Appellants.

Horvitz & Levy, John A. Taylor, Jr., Frederic D. Cohen, Jason R. Litt; Weissmann Wolff Bergman Coleman Grodin & Evall, Michael Bergman, Steven Glaser and Julie B. Ephraim for Defendant and Appellant.

## OPINION

**KLEIN, P. J.**—Defendant and appellant Warner Bros. Entertainment, Inc. (Warner), appeals a judgment on a jury verdict awarding plaintiffs and appellants Alan Ladd, Jr., Jay Kanter, L-K Producers Corporation, Ketram Corporation and Kanter Corporation (collectively, Ladd) $3,190,625 in damages. Warner also appeals the trial court's orders denying its four motions for judgment notwithstanding the verdict (JNOV).[1]

Ladd cross-appeals from the judgment, insofar as the trial court granted Warner's motions for nonsuit on certain claims by Ladd.[2]

Warner licensed packages of movies to broadcast television and cable networks. Ladd's movies were included in those packages. In a practice known as "straight-lining," Warner allocated the same share of the licensing fee to every movie in a package, regardless of its value to the licensee. The gravamen of Ladd's action against Warner is that by allocating the same portion of the licensing fee to every movie in a package without regard to the true value of each movie, Warner deprived Ladd of a fair allocation of the licensing fees to which Ladd was entitled as a profit participant.

 We hold that under the implied covenant of good faith and fair dealing, Warner was bound to act in good faith toward profit participants. Warner had an obligation, as conceded by a Warner executive, to "fairly and accurately allocate license fees to each of the films based on their comparative value as part of a package." Therefore, the record supports the jury's determination that Warner's straight-lining method of allocating licensing fees to profit participants breached the implied covenant of good faith and fair dealing.

---

[1] An order denying a motion for JNOV is appealable. (Code Civ. Proc., § 904.1, subd. (a)(4).)

[2] The partial nonsuit ruling is reviewable on the appeal from the final judgment entered on the subsequent verdict. (*Wilson v. Century 21 Great Western Realty* (1993) 15 Cal.App.4th 298, 304 [18 Cal.Rptr.2d 779].)

We further hold that because the statute of limitations is an affirmative defense, a defendant who asserts the plaintiff's claims are partially barred by the statute of limitations has the burden of proving which portion of plaintiff's damages are time-barred. Here, Warner's failure to present damage segregation evidence constituted a failure of proof on an affirmative defense, entitling Ladd to recover all the proven damages.

In sum, we uphold the jury's verdict in its entirety. However, the orders granting nonsuit on Ladd's claims relating to Blade Runner (The Ladd Co. 1982) and deletion of screen credits and deletion of Ladd's company logo are reversed and the matter is remanded for a retrial of those claims.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

This action arises out of Ladd's claim that Warner undervalued and underpaid the license fees attributable to the following 12 motion pictures: Blade Runner, Body Heat (The Ladd Co. 1981), Night Shift (The Ladd Co. 1982), Tequila Sunrise (The Mount Co. 1988), Outland (The Ladd Co. 1981), Chariots of Fire (Enigma Prods. 1981), and the Police Academy franchise, consisting of the original and sequels 2, 3, 4, 5 and 6.

By way of background, in 1979, Warner and Ladd entered into a joint venture, essentially a "mini-studio" within a studio. Ladd had control over development of movies, financing of movies, production and distribution. Warner's role was to finance the films.

In 1985, the parties entered into a termination agreement, under which the parties ended their joint venture, with Warner remaining obligated to pay Ladd the profit participation called for under their earlier agreement.

In 1993, Ladd conducted a profit participation audit (the first audit) of the motion pictures for the period from October 1, 1988, through September 30, 1992. The audit did not cover Blade Runner because Warner represented to Ladd said movie was unprofitable and was "so far in the red it was not worthwhile to issue [profit] statements." (In Mar. 1992, Warner provided Ladd with a one-page statement indicating Blade Runner had lost $19.5 million as of Dec. 31, 1991.)

Following this audit, the parties entered into a 1996 settlement agreement and release. Warner agreed to pay Ladd $500,000 and to increase royalty payments on home videos. Pursuant to the 1996 settlement agreement, the parties released "all claims, whether known or unknown, arising from, based on, or in any way relating to the distribution and exploitation through September 30, 1992 of the motion pictures (the 'Properties') produced pursuant to, and/or referenced in" the earlier agreements between Warner and Ladd.

In 2001, Ladd learned another Blade Runner investor, Empress Investments (Empress), was receiving payments from Warner even though Warner told Ladd the movie was unprofitable. Ladd retained James Perry (Perry) to audit Warner's records (the second audit). Warner limited Perry's audit to the four-year period from April 1, 1997, through March 31, 2001, for all films except Blade Runner and Outland, which Warner allowed Perry to audit back to their inception. Following the second audit, Ladd filed the instant lawsuit.

### 2. *Proceedings.*

#### a. *Pleadings.*

On July 31, 2003, Ladd filed this action against Warner. The operative third amended complaint included causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and negligent misrepresentation. In addition to compensatory and punitive damages, Ladd sought an accounting and imposition of a constructive trust. The gravamen of the action is that Warner deprived Ladd of the bargained-for profit participation in the termination agreement by undervaluing Ladd's films relative to other films in television licensing packages.

#### b. *Trial testimony.*

On July 9, 2007, the matter came on for a jury trial. The evidence showed Warner licensed films to broadcasters or to cable in a package, in a practice known as straight-lining, in which "every feature film in that group or package is given the exact same value regardless of its value to the broadcaster or to the channel." David Simon (Simon), Ladd's expert, with 32 years' experience in the television and entertainment industry, testified that in treating every movie as though it had the same value, "the studio was not doing its expert work, as a provider or distributor of content, in weighing the value of each of these titles . . . ."[3]

---

[3] The licensing agreements between Warner and third parties were *not* the contracts being sued upon. Ladd was suing Warner for breach of the termination agreement. The licensing agreements reflected the underallocation of licensing fees and thus a breach of the termination

Simon's testimony in this regard was corroborated by Eric Frankel (Frankel), the president of Warner's domestic cable distribution, who was called by Ladd as an adverse witness. (Evid. Code, § 776.) Frankel testified that in the licensing process, Warner has an obligation to act in good faith toward profit participants, and as part of Warner's good faith obligation, Warner was required to "fairly and accurately allocate license fees to each of the films based on their comparative value as part of a package."

With respect to damages, Simon determined Warner should have allocated an additional $97 million in licensing fees to Ladd's films. Ladd was entitled to 5 percent of gross revenues on all films once Warner recouped its costs, except for Chariots of Fire, on which Ladd was entitled to 2.5 percent. Thus, on the $97 million in underallocated licensing fees, Ladd's profit participation should have been $3,190,625.

c. *Nonsuit rulings.*

After Ladd's case-in-chief, the trial court granted nonsuit on Ladd's cause of action for fraud in connection with Blade Runner, finding "no evidence of fraud."

The trial court also granted nonsuit on Ladd's claim for Blade Runner profits, on the ground said claim was foreclosed by the 1996 settlement agreement. With respect to Blade Runner, Ladd was permitted to proceed solely on the claim that Warner had underallocated licensing fees to said film during the four-year period before this action was commenced.

The trial court also granted nonsuit on Ladd's claim Warner improperly deleted Ladd's screen credits or company logo from the films Chariots of Fire and Once Upon a Time in America (Embassy Internat. Pictures 1984). The trial court ruled it found "no evidence of any lost opportunities or any ascertainable loss due to loss of screen credit in the record."

The defense rested its case on July 26, 2007.[4]

---

agreement's implied covenant of good faith and fair dealing. The licensing agreements also were relevant to establishing the extent of Ladd's damages.

[4] On July 27, 2007, one day after the defense rested, Warner sent Ladd's counsel a letter demanding, for the first time, that the Blade Runner claims be arbitrated pursuant to the arbitration clause in the 1996 settlement agreement. Ladd refused and Warner continued to participate in the trial through judgment. On December 12, 2007, two days before filing its notice of appeal in the instant action, Warner filed a new action in the superior court, seeking to compel arbitration. The trial court denied the petition to compel, ruling: "Having engaged in extensive, merits litigation in the Prior Action, including a lengthy trial, and having failed to petition for arbitration during those proceedings, Warner waived its right to arbitrate the matters advanced in this action." Warner appealed. The order denying Warner's petition to

#### d. *The verdict.*

Due to the nonsuit rulings, only two causes of action went to the jury: breach of contract and breach of the implied covenant of good faith and fair dealing. The jury was instructed, inter alia, "There are no express contractual obligations restricting the discretion afforded to [Warner] in licensing the library films in which [Ladd] [has] a participation interest. Therefore, to prove their claims regarding [Warner's] licensing of the films, [Ladd] must prove that [Warner] breached the contract or the implied covenant of good faith and fair dealing."

On August 2, 2007, the jury returned a special verdict in Ladd's favor. The jury specifically found Warner breached the contract with Ladd or the covenant of good faith and fair dealing implied into the contract, and that Ladd suffered a monetary loss in the form of underpayment of profit participation as a proximate result of that breach. The jury determined that in the period from August 1, 1999 (four years prior to the filing of the complaint), to the present, Warner had underallocated the license fees for Ladd's films, including Blade Runner, in the amount of $97,251,000 (which was consistent with Simon's testimony). With respect to damages, the jury found Ladd should have been paid $3,190,625 in additional profit participation on said license fees.

Judgment on the verdict was entered on September 25, 2007.

#### e. *Posttrial motions.*

On October 9, 2007, Warner filed a motion for new trial as well as four motions for JNOV, seeking entry of judgment in its favor. Warner later withdrew its new trial motion.

Warner sought JNOV on the following grounds: Ladd was restricted to recovering damages incurred on or after August 1, 1999, but the verdict included damages on claims barred by the statute of limitations; the evidence was insufficient as a matter of law to support the amount of damages awarded by the jury; the evidence was insufficient to support the finding that the damages awarded were proximately caused by any breach; and the evidence was insufficient to support the finding that Warner breached its contract, including the implied covenant of good faith and fair dealing, with Ladd.

---

compel arbitration was affirmed in *Warner Bros. Entertainment, Inc. v. Ladd* (Dec. 8, 2009, No. B208831) (nonpub. opn.). (Evid. Code, §§ 452, subd. (d), 459.)

On November 19, 2007, the JNOV motions came on for hearing. Warner's counsel acknowledged that in withdrawing the motion for new trial, Warner was purposely "going for broke," leaving the trial court with only two choices—either to uphold the entire verdict for Ladd or to enter a judgment in favor of Warner, notwithstanding the jury's verdict.[5]

The trial court denied all four motions for JNOV. It found substantial evidence supported the jury's determination that the way in which Warner allocated license fees to Ladd breached the implied covenant of good faith and fair dealing, and that said breach caused Ladd damage.

As for the JNOV motions relating to the amount of damages, the trial court expressed concern that some portion of the damage award represented damages which may have been incurred prior to August 1, 1999, but recognized "nobody ever told the jury how much" of the licensing fees were earned before or after that date. "[A]t no time did anybody ever break down these numbers." The trial court explained "the reason I can't grant the motion for JNOV . . . is because there is evidence to support [the verdict] . . . . I can't say the plaintiff cannot win. . . . [I]f I grant the JNOV, I'm saying that there is no money that they can get. [¶] And it would have been easier for this Court if there was . . . the new trial [motion]."

> f. *The appeals.*

The parties filed timely notices of appeal and cross-appeal. Warner appealed the judgment and the orders denying its motions for JNOV. Ladd appealed the judgment, specifying the partial grant of nonsuit.

## CONTENTIONS

Warner contends: Ladd failed to prove Warner breached its contractual obligations by undervaluing Ladd's films in license fee agreements; the

---

[5] By forgoing a motion for new trial on the ground of excessive damages, Warner also was "going for broke" on appeal. "*Failure to move for a new trial on the ground of excessive . . . damages precludes a challenge on appeal to the amount of damages if the challenge turns on the credibility of witnesses, conflicting evidence, or other factual questions.* [Citations.] A trial court ruling on a new trial motion on the ground of excessive or inadequate damages must weigh the evidence and acts as an independent trier of fact. [Citations.] Thus, the trial court is in a far better position than the Court of Appeal to evaluate the amount of damages awarded in light of the evidence presented at trial. [Citations.] [¶] 'When defendants first challenge the damage award on appeal, without a motion for new trial, they unnecessarily burden the appellate courts with issues which can and should be resolved at the trial level. [Fn. omitted.]' [Citation.]" (*County of Los Angeles v. Southern Cal. Edison Co.* (2003) 112 Cal.App.4th 1108, 1121 [5 Cal.Rptr.3d 575], italics added.)

judgment must be reversed because Ladd failed to specify the amount of damages Ladd incurred during the permissible time period; assuming Simon's testimony provides a basis for establishing liability and calculating Ladd's damages during the relevant timeframe, the judgment should be reduced to the maximum amount of damages supported by his testimony; and in the event this court does not reverse the judgment outright or reduce it to the maximum supported by Simon's testimony, this court should grant Warner a new trial.

Ladd contends the trial court erred in its nonsuit rulings because more than sufficient evidence and inferences exist to allow a reasonable jury to conclude Warner knew the falsity of its representations that Blade Runner was not profitable; the settlement of the 1992 audit claims did not bar Ladd's Blade Runner profitability claims, especially those accruing after 1992; and Warner's movie credit and logo deletions undeniably damaged Ladd, precluding nonsuit.

## DISCUSSION

*WARNER'S APPEAL*

1. *Substantial evidence supports the jury's determination Warner breached the implied covenant of good faith and fair dealing.*

As indicated, the special verdict included the finding that Warner breached the contract with Ladd or the covenant of good faith and fair dealing implied into the contract. Warner challenges the sufficiency of the evidence to support said finding. The contention fails.

a. *Warner owed a duty to allocate license fees fairly to Ladd's movies.*

█ As a preliminary matter, every contract in California contains an implied covenant of good faith and fair dealing that " 'neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 [97 Cal.Rptr.2d 151, 2 P.3d 1].) The implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 [6 Cal.Rptr.2d 467, 826 P.2d 710].)

Consistent therewith, Frankel, the president of Warner's domestic cable distribution, who was called by Ladd as an adverse witness (Evid. Code, § 776), testified that in the licensing process Warner has an obligation to act in good faith toward profit participants. Frankel acknowledged that as part of Warner's good faith obligation, Warner was required to "fairly and accurately allocate license fees to each of the films based on their comparative value as part of a package." Frankel testified the valuation factors included "the vintage of the film, the box office, the genre, the star, the awards, the utility, can you play it in multiple day parts or is it a movie that's too sexy that maybe you can only play at 10:00 at night."

Thus, Ladd established Warner owed a duty to fairly allocate license fees to each of the films based on their relative value in an overall package.

> b. *Substantial evidence supports the jury's finding that Warner breached said duty to Ladd.*

In this regard, Ladd's expert witness, Simon, testified Warner often licensed films to broadcasters or to cable in a package, in a practice known as straight-lining, in which "every feature film in the package is given the exact same value regardless of its value to the broadcaster or to the channel." In evaluating its movies, Warner internally assigned each movie a grade of A, B or C.[6] Simon generally agreed with Warner's ratings and noted that all Ladd's films were rated either A or B. The problem was that Warner allocated the same proportion of the license fee to each title in the package, irrespective of the film's letter grade. Simon opined that in treating every movie as though it had the same value, "the studio was not doing its expert work, as a provider or distributor of content, in weighing the value of each of these titles . . . ."

Simon also testified that in non-straight-lined film packages, movies that were less valuable than Ladd's received greater value. For example, there were times when Daffy Duck and Bugs Bunny animated films were allocated double the money that was allocated to Chariots of Fire, a valuable feature film that won multiple Academy Awards, including Best Picture. Those animated films are wholly owned by Warner, which means Warner keeps every dollar generated by licensing fees on those films. Simon determined that Warner was overallocating license fees to movies that were studio owned or that did not have profit participants.

---

[6] Movies that are rated a C are "relegated to filler material." There is a need for C movies because many channels broadcast 24 hours a day. However, Frankel acknowledged there is no licensing demand for individual C movies, which is why they are bundled in a package together with A and B movies. Leslie Cohen, director of film acquisitions at HBO, testified that in one licensing deal, Warner added a group of old Tarzan movies to a licensing package at no cost. Warner then allocated a license fee of $40,000 to each of the Tarzan movies, thereby reducing other movies' allocations in the package.

c. *Warner's purported justifications for straight-lining are meritless.*

Warner seeks to avoid the unfairness of its allocations by contending that in certain cases, the buyers insisted on paying the same license fee for every film they acquired. However, the evidence showed licensees only care about the aggregate amount they are paying for an entire package of films. For example, in one licensing deal between Warner and HBO, a package of films was negotiated for a price of $141,475,000, of which $400,000 was allocated to Chariots of Fire. However, HBO did not care whether Warner internally allocated $1 million of the licensing fee to Chariots of Fire, and some other picture would have been allocated $600,000 less.

Further, Robert Levi, a defense expert, testified the buyer/licensee "did not have a say in what the allocation would be from Warner Bros.'s standpoint," and the buyer could not dictate how Warner would allocate internally the monies from a licensing package to specific films within that package. Thus, Warner's claim "the buyer made me do it" is meritless.

Warner also defends its straight-lining of films in a licensing package on the ground it is "undisputed" the practice of straight-lining is common in the industry. However, the prevalence of straight-lining was a disputed issue at trial. Defense expert Levi testified it was "unusual" that a licensing agreement "would list each film in the package as having an equal license fee." The evidence also showed MGM did not engage in straight-lining because different movies have different values.

Moreover, even if straight-lining were a common practice, it would not absolve Warner of its duty to Ladd, as a profit participant, to fairly allocate fees derived from licensing packages.

d. *Conclusion as to breach of the implied covenant of good faith and fair dealing.*

Substantial evidence supports the jury's determination that Warner breached its obligation to Ladd, as a profit participant, to fairly allocate licensing fees to Ladd's movies based on their relative worth in licensing packages.

Warner's remaining contentions all relate to Ladd's damages. We now address those issues.

2. *No merit to Warner's contention the judgment must be reversed on the ground the $3,190,625 verdict includes damages that were incurred prior to the permissible time period; Warner had the burden at trial to prove all facts essential to its affirmative defense and failed to do so.*

Warner contends the judgment cannot stand because the record contains no evidence identifying the amount of damages Ladd suffered during the permissible time period. Warner asserts the verdict includes damages that are barred by the 1996 settlement agreement, which agreement expressly barred claims arising through September 30, 1992. Warner further argues the verdict includes damages incurred prior to August 1, 1999, damages which are barred by the four-year statute of limitations. (Code Civ. Proc., § 337.)[7]

Warner's contention the verdict cannot stand because it includes damages that preceded the permissible time period is resolved by certain basic principles. The statute of limitations is an affirmative defense, as is a settlement and release. (*Samuels v. Mix* (1999) 22 Cal.4th 1, 10 [91 Cal.Rptr.2d 273, 989 P.2d 701]; *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 131 [3 Cal.Rptr.2d 275].) As with any affirmative defense, Warner had the burden to prove all facts essential to its defenses that the 1996 settlement and release and the 1999 accrual of the statute of limitations barred some portion of Ladd's damages. (Evid. Code, § 500; *Samuels v. Mix, supra*, 22 Cal.4th at p. 10 ["a defendant must prove the facts necessary to enjoy the benefit of a statute of limitations . . ."]; *Walton, supra*, at p. 131 [defendant bears burden of proving a claim is barred by a release].)[8]

---

[7] Ladd commenced this action on July 31, 2003. Both the cause of action for breach of written contract and the cause of action for breach of the implied covenant of good faith and fair dealing are governed by the four-year statute of limitations. (Code Civ. Proc., § 337, subd. (1); *Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 220 [285 Cal.Rptr. 717] [action for breach of implied covenant of good faith and fair dealing is controlled by four-year limitations period for an action arising on written contract].) Accordingly, the trial court instructed the jury "Plaintiffs may only recover damages, if any, based on the alleged underpayment of revenue received from August 1, 1999 through the present."

[8] *Walton v. City of Red Bluff, supra*, 2 Cal.App.4th at page 131, states: "Where a claim is unenforceable the burden is on the defense to demonstrate unenforceability. When a claim is barred by the *statute of limitations* the issue must be pleaded as an affirmative defense. [Citation.] Other claims of unenforceability must be raised by affirmative defense, such as a claim a contract is barred by the *statute of frauds* [citations] [waiver at trial by failure to object], *res judicata* [citations] [same], *release* [citation], or *accord and satisfaction* [citation]." (Italics added.)

██ As stated in *Western Recreational Vehicles v. Swift Adhesives* (9th Cir. 1994) 23 F.3d 1547, 1553, "[t]he statute of limitations is an affirmative defense and its elements must be proved by the party asserting it. Where a part of plaintiff's claim for damages is barred by the statute of limitations and a part of it is not, the defendant pleading the statute as an affirmative defense has the burden of specifically proving which portion of plaintiff's damages are barred by the statute. Failure to so prove will result in a complete failure of the affirmative defense. . . . The obligation to segregate the damage should fall upon the wrongdoer and not upon the person he has harmed." (Italics omitted.)

Although Warner faults Ladd for not presenting evidence to establish what portion of damages may have been barred by Warner's statute of limitations and release defenses, the burden of producing such defense evidence rested with Warner, not with Ladd.

We reiterate the trial court's ruling on Warner's motions for JNOV: "I didn't hear this argument before. The one thing I remember about this case is that I couldn't put my finger on an amount—a specific amount before and after the pertinent dates. . . . I could never put my finger on the amounts before 1992, after 1992, before 1999, after 1999. [¶] . . . [T]here's no question that before 1992—that was released by the [1996] agreement. There's no question that the statute of limitations barred anything before August the 1st, 1999. I have those dates firm in my head and I understand that." The trial court explained, "[y]ou're giving me an argument that was never made to the jury. Nobody wanted to play with numbers in this case. This is the first time we're playing with numbers."

The essence of the "numbers" presented to the jury was as follows. Simon testified Ladd's films were underallocated $97 million in licensing fees. Ladd's claimed profit participation percentage in said licensing revenues was $3,190,625. The jury awarded Ladd precisely that amount in compensatory damages.

When Simon testified to the amount of underallocated licensing fees, Warner could have elicited on cross-examination what portion, if any, of the $97 million in licensing fees preceded August 1, 1999. Alternatively, Warner could have presented its own witnesses to break down the licensing fees it

earned from Ladd's movies, year by year. Warner chose not to do so at trial. Warner cannot at this juncture complain about a damages case it wishes it had presented at trial.

As the trial court stated to Warner's counsel at the hearing on the JNOV motions, "you've got accountants, and . . . there's absolutely no reason why they couldn't have been broken down. But I don't know why they weren't broken down. But you've taken the position, 'Well, since you didn't break them down . . . there's no evidence to support the verdict.' . . . [¶] But I cannot say . . . that the plaintiff cannot win. [The motion for JNOV is] a dispositive motion. And if I [were] to grant the JNOV, I'd say under no circumstances can they win. And that's not true." The trial court added, "you know, I get this all the time in cases where . . . the defendants will say, 'Well, if you are going to award damages—and I don't think you should—let me tell you what—the damages that you should award' . . . 'if any.' "

The trial court also recognized Warner's counsel had *intentionally* placed the court in a "dilemma," by not seeking a new trial on the ground of excessive damages and moving solely for JNOV. However, because the evidence, and particularly Simon's testimony, provided substantial support for the damages awarded by the jury, a JNOV did not lie.

In sum, we reject Warner's contention the judgment must be reversed because Ladd failed to specify the amount of damages incurred during the permissible time period. We hold Warner had the burden at trial to show what portion, if any, of Ladd's damages may have been barred by the 1996 settlement agreement (which released all claims through Sept. 30, 1992) or by the August 1, 1999 accrual of the four-year statute of limitations. Warner failed to meet its burden below, entitling Ladd to recover all the proven damages.

[[ ]]*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1298.

## DISPOSITION

The orders denying Warner's motions for JNOV are affirmed. The orders granting nonsuit on Ladd's Blade Runner and screen credits/logo claims are reversed and the matter is remanded for a retrial of those claims. In all other respects, the judgment is affirmed. Ladd shall recover costs on the appeal and cross-appeal.

Kitching, J., and Aldrich, J., concurred.

The petition of appellant Warner Bros. Entertainment, Inc., for review by the Supreme Court was denied August 11, 2010, S184262. George, C. J., did not participate therein.