Filed 8/25/20  Monster v. Beats Electronics CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MONSTER, LLC et al.,<br><br>     Plaintiffs, Cross-defendants and Appellants,<br><br>     v.<br><br>BEATS ELECTRONICS, LLC et al.,<br>     Defendants, Cross-complainants and Appellants. | B285994<br><br>(Los Angeles County<br>Super. Ct. No. BC595235) |

APPEALS from judgments and postjudgment orders of the Superior Court of Los Angeles County, William F. Fahey, Judge. Judgments and postjudgment orders are affirmed.

The Ehrlich Law Firm, Jeffrey I. Ehrlich; Gorman & Miller and Kirk M. Hallam for Monster LLC and Noel Lee, Plaintiffs, Cross-defendants and Appellants.

Gibson, Dunn & Crutcher, Theodore J. Boutrous, Jr., Theane D. Evangelis, Bradley J. Hamburger and Daniel R. Adler for Beats Electronics, LLC, Defendants, Cross-complainants and Appellants.

Perkins Coie, David J. Burman, Bobbie J. Wilson, Donna M. Strain and Alisha C. Burgin for HTC America Holding, Inc., Defendant and Respondent.

Munger, Tolles & Olson, Robert L. Dell Angelo, Mark R. Yohalem and Allison B. Stein for Paul D. Wachter, Defendant and Respondent.

————————————

Monster LLC and Noel Lee, its chief executive officer, sued Beats Electronics, LLC, HTC America Holding, Inc. and Paul D. Wachter, a member of Beats's board, alleging Beats, assisted by HTC and Wachter, engaged in a fraudulent scheme to deprive Monster and Lee of their interest in Beats and revenue from its products. Beats cross-complained against Monster, alleging it had breached the release and nondisparagement provisions in a 2009 agreement between the parties. The trial court entered judgments and postjudgment orders in favor of Beats, HTC and Wachter after they prevailed on summary judgment motions and a jury returned a verdict in favor of Beats on its cross-complaint. We affirm.

**PROCEDURAL OVERVIEW**

Monster and Lee[1] filed this action in January 2015 against Beats, HTC, Wachter and Beats's founders Andre Young

_____

[1] Lee filed the lawsuit in his individual capacity and as the sole trustee of the Noel Lee Living Trust. For simplicity, we refer

2

(popularly known as Dr. Dre) and Jimmy Iovine. The complaint alleged causes of action by Monster for fraud and deceit, aiding and abetting fraud and deceit, breach of duty of trust and confidence, aiding and abetting breach of duty of trust and confidence and unfair competition; and by Lee for fraud and deceit, breach of fiduciary duty, aiding and abetting breach of fiduciary duty and violations of various provisions of the California Corporations Code. The court sustained demurrers by Dr. Dre and Iovine without leave to amend, and they were dismissed from the case. Those dismissals are not at issue in this appeal.

Beats, HTC and Wachter filed separate motions for summary judgment, or in the alternative summary adjudication, in April 2016. In late August 2016, one week before the scheduled start of trial, the court granted all three motions. Judgment was entered in favor of HTC and Wachter, and Monster and Lee filed a timely notice of appeal.

Beats tried its cross-complaint against Monster to a jury in December 2017. Judgment was entered in favor of Beats for slightly more than $11.5 million, the attorney fees and costs it had incurred in defending against Monster's and Lee's claims. Monster and Lee filed a timely notice of appeal. The trial court amended the judgment in favor of Beats to include postjudgment interest. Monster and Lee filed another notice of appeal. Finally, after granting Beats's motion for attorney fees incurred to try its cross-complaint, the trial court entered a further amended judgment awarding Beats an addition $2.6 million. Monster and Lee filed a fourth notice of appeal.

only to "Lee," whether as a formal matter Lee acted personally or in his capacity as trustee.

3

We ordered all four appeals consolidated.  On appeal Monster and Lee contend only that the trial court erred in granting summary judgment in favor of Beats, HTC and Wachter.  They make no separate challenge to any of the court's other rulings or orders, including the damage award and attorney fees granted Beats on its cross-complaint, other than arguing, if we reverse the summary judgment orders, the other orders must be reversed as well.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Monster License Agreements*

Dr. Dre and Iovine entered into a five-year license agreement with Monster, an experienced audio-hardware company, in January 2008 for the manufacture and sale of "Beats by Dre" headphones.  Monster manufactured and distributed the headphones; Dr. Dre and Iovine received royalty payments and agreed to engage in celebrity marketing activities.

Dr. Dre and Iovine founded Beats in October 2008.  On August 20, 2009 Beats and Monster entered into an amended license and promotion agreement, which superseded the January 2008 agreement.  The 2009 license agreement provided Beats, the licensor, owned all right, title and interest in and to "the Marks, Domain Names and Headphone Designs," and Monster owned all right, title and interest in and to "the Products, including all intellectual property embodied in them."  Beats agreed to have Interscope Records (co-founded by Iovine) market and promote Beats products and Dr. Dre make promotional appearances.

The 2009 license agreement provided it would continue in effect until terminated.  Each party was entitled to terminate the agreement for cause (a material breach of contract).  Beats was also authorized to terminate the agreement "at any time on or

4

after the earlier of (i) January 7, 2013 [the termination date for the original license agreement] or (ii) the closing of a transaction that results in a Change of Control." The parties' operating agreement defined that term to include "the acquisition after the date of this Agreement, directly or indirectly, by any Person or group . . . of the beneficial ownership of Units of [Beats] possessing more than 50% of the total combined voting power of all outstanding units of [Beats]."

Beats was required to give at least one-year's notice of its intent to terminate the agreement, except, if based on a change of control, notice had to be provided only for "as long as reasonably possible." Upon termination Monster was required to transfer all ownership rights in the industrial designs of all Beats products to Beats or its assignee and to grant Beats or its assignee a perpetual, royalty-free, worldwide nonexclusive license on all intellectual property necessary for the continued manufacture and sale of all Beats-branded products.

As part of the consideration for the 2009 license agreement, Beats granted Monster or its designee a 5 percent ownership interest in the company. Monster designated Lee, through his living trust, to receive the Beats ownership interest. The separate agreement by which Lee acquired that interest (the 2009 unit grant and repurchase rights agreement) gave Lee the right to require Beats to repurchase his shares upon termination of the 2009 license agreement (a "put"). If termination occurred because of a change of control and Lee exercised his put right, he was to be paid "the amount and form of consideration paid to the other owners" in the change of control transaction.

## 2. *The Beats-HTC Transaction*

In mid-2011 Beats agreed with a subsidiary of publicly traded HTC Corporation for HTC to purchase a 51 percent interest in Beats for $300 million. The parties memorialized the transaction in an August 11, 2011 agreement; the transaction closed on October 19, 2011. As the majority owner of the company, HTC appointed four of its executives as directors on Beats's seven-member board.

Once the Beats-HTC transaction closed, HTC, Beats and Beats's other shareholders, including Lee, executed an operating agreement that, among other provisions, gave the minority owners a put right requiring HTC to purchase, using a specific formula, their 49 percent interest in Beats after December 31, 2013 and gave HTC a right to purchase those minority shares any time on or after December 31, 2016.

In discussing the initial Beats-HTC transaction, Monster notes that in late December 2010, before Beats began its preliminary discussions with HTC, Iovine and Wachter had discussions about Beats's value in an acquisition. Wachter advised Iovine that a partial sale without giving up "real control" would discount the value by approximately 20 percent. In the same period Wachter told Iovine the "change of control provisions are very clear. If we sell over 50 percent of the company, we're clear, where we can get rid of Monster."

## 3. *Termination of the Monster-Beats 2009 License Agreement*

Following execution of the August 2011 agreement with HTC, Beats notified Monster it was invoking the termination provision in the 2009 license agreement. The parties agreed to a June 30, 2012 termination date. Notwithstanding that effective

date, however, the parties agreed that Monster would retain the right to act as Beats's sales representative and distributor through the end of 2012 and also would retain the right to royalties and commissions through the end of 2013. The June 30, 2012 termination agreement included a mutual release of all claims existing as of June 30, 2012.

4. *HTC's Experience with Beats Products and Its Decision To Partially Divest Its Ownership of the Company*

After the acquisition closed, HTC provided Beats with products and manufacturing services, including placing personnel in factories manufacturing Beats products to resolve supply chain issues. Between October 2011 and April 2012 HTC and Beats jointly developed and marketed several products, including headphones bundled with HTC phones.

In the first quarter of 2012, however, HTC's revenue declined, while Beats's revenue increased. According to HTC, its new chief financial officer became concerned the Beats's minority owners' right to require HTC to purchase their units at a price based on Beats's revenue was an unsustainable contingency. After unsuccessfully attempting to negotiate for Beats to surrender the put right, including by refusing to lend money to Beats that Beats needed and expected to finance its operations, on July 20, 2012 HTC and Beats agreed that HTC would sell back a 25 percent stake in Beats for $150 million and loan Beats $225 million. In return, the other Beats owners would relinquish their put rights. Lee, along with other investors, paid for Beats's reacquisition of the units by giving a nonrecourse promissory note to HTC.

Monster's discussion of the July 20, 2012 transaction includes quotations from an internal email from a senior HTC

employee with talking points that included the statements, "[I]t's not the end of the world.  Actually, a good thing for HTC.  [¶] . . . We never intended to run Beats when we originally invested."  In a follow-up internal email, HTC's chief operating officer stated, "I am slightly worried about the statement 'htc never intended to control beats.'  While this is absolutely true, beats wanted us to buy 51 percent to effect a change of control and thereby remove monster.  If any statement even hints that the rapid shift in shareholding was part of a grand and well conceived plan, we will expose both beats and us to litigation from monster."

     5. *Lee Sells Beats Units*

On September 10, 2012 Lee wrote Beats stating he intended to partially exercise his put right under the 2009 unit grant and repurchase rights agreement based on termination of the 2009 license agreement the prior year.  Lee sold back a 3.75 percent interest, retaining a 1.25 percent ownership stake in Beats.  The $300 million price paid by HTC for its 51 percent interest in Beats was used to determine the price for Lee's 3.75 percent, as specified in the 2009 unit grant and repurchase rights agreement.  The December 2012 unit repurchase agreement between Beats and Lee contained broad mutual releases of all claims and causes of action, "including, without limitation, causes of action for breach of fiduciary duty, negligent misrepresentation, fraud, fraudulent inducement and state and federal securities laws violations."

     6. *Beats Looks for Another Investor*

In 2013 Beats began a search for another investor and engaged in discussions with Carlyle Group, a private equity firm, and with Apple.  On March 13, 2013 Beats and Apple signed a

"Confidentiality Agreement for Possible Transaction–Mutual." Discussions between the two companies continued throughout 2013; but Apple's chief executive officer, Tim Cook, expressed interest only in acquiring Beats Music, a separate subscription music-streaming service, not Beats Electronics, the audio-hardware business.

Monster and Lee emphasize an internal Apple memorandum, dated September 10, 2013, which states Iovine offered to sell all of Beats to Apple for $2.5 billion. The memorandum also states Iovine indicated a sale price for Beats Music only of $2 billion once the service reached 20 million subscribers and observed, "This likely ends pretty quickly unless we want to think about buying the headphone business." At approximately the same time, at a meeting between a senior Apple executive and Iovine, also attended by Wachter, where the possible acquisition of Beats Music was discussed, the executive told Iovine an acquisition of Beats Electronics was 100 percent off the table.

In the fall of 2013 Beats sold a 31 percent interest in the company for $501 million to affiliates of Carlyle, based on a valuation of the company of approximately $1.6 billion. At the same time as the Carlyle transaction, HTC sold back its remaining interest in Beats for $265 million. The repurchase of HTC's stake in the company triggered the obligation to retire $150 million in promissory notes given by Beats investors in connection with the July 20, 2012 reacquisition of HTC shares.

7. *Lee Sells His Remaining Interest in Beats*

As the Carlyle and HTC transactions proceeded, Lee considered whether to sell his remaining interest in Beats: Unlike the situation for Beats's other owners, because Lee's

holding at this point was quite small, a proposed dividend by Beats would not be sufficient to cover the repayment of Lee's promissory note to HTC.

On September 13, 2013 Lee spoke by telephone with Wachter. In their unverified complaint Monster and Lee described that conversation in the following terms: "[A]s part of the Carlyle acquisition, Wachter called Lee to advise him of his obligations as a 1.25% shareholder. Wachter informed Lee that, pursuant to a promissory note from Lee to HTC as part of the 'Change of Control' deal, Lee would have to immediately pay HTC $3 to $5 million to retain his 1.25% in Beats. In truth and as Wachter knew, any payment by Lee under the promissory note was much closer to $3 million, not $5 million. Wachter—feigning altruism—offered Lee an alternative: Lee could cause Beats to purchase Lee's remaining shares for gains of approximately $5.5 million. Weighing these two options, Lee asked Wachter whether Beats had any liquidity events on the horizon: 'Paul, if I retain my interest in Beats, when do you think I can cash out?' Unflinching, Wachter respond: 'There will be no liquidity event in the next year or two; nothing is on the horizon.'" (Emphasis in original.)

As ultimately revealed by a transcript of Lee's secret recording of this conversation,[2] however, when explaining what

---

[2] Lee's surreptitious recording and the fact Monster's general counsel was listening to the call were not discovered until after the court had overruled Wachter's demurrer. Thereafter, despite properly served discovery demands seeking all records of the September 13, 2013 call and a representation the recording would be produced by the deadline to file summary judgment motions, Monster and Lee did not provide defendants a copy of the recording until late May 2016. Then, although Wachter's

Lee would have to pay to retire the promissory note, in addition to what Lee received as a divided from Beats, Wachter said, "[Y]ou end up coming out of pocket somewhere between three and five million dollars. My guess is it's going to be more like three to three and a half. I don't think it'll be as much as five. And then you stay in."[3]

In addition, in response to Lee's question, "Do you guys have an exit plan or something," Wachter actually replied, "No. We don't have a plan. I mean, you know obviously, at some point, well—you know, Jimmy. At some point we'll exit, but I mean, I don't think anything—I doubt there will be any other liquidity event in the next year or two because we're doing this big private equity deal and so you know, anything is possible. I mean, you know, it could be that down the road we pay a dividend, or we do another deal and sell the company, but there is nothing on the horizon, Noel." "The only thing—the only thing I'd say could happen would be another dividend later in the year—later next year or so."

After Beats's president confirmed the following week that "there will be no liquidity event in the near future," Lee sold his remaining 1.25 percent interest in Beats for approximately

statements were purportedly summarized in declarations filed by Lee and Monster's general counsel in opposition to summary judgment, trial counsel objected to inclusion of a certified transcript of the recording with Wachter's reply memorandum, arguing submitting evidence in support of a reply is improper. The trial court was not persuaded, to say the least.

[3]     Lee's lawyer was informed that Lee would have to pay about $3 million to retire the note if Beats made an excess distribution of $100, which Beats's counsel told Lee's lawyer was "reasonably likely."

$12.9 million; after paying the HTC note, he netted approximately $5.6 million. The 2013 unit repurchase agreement that effected this sale by Lee contained a broad set of mutual releases in language substantially similar to the releases in the December 2012 unit repurchase agreement. The 2013 agreement provided it would be governed by Delaware law.

8. *Apple Acquires Beats*

In early 2014 Apple changed its view of a possible acquisition of Beats and its hardware business. Apple began its formal due diligence in March 2014 and agreed to buy Beats for approximately $3 billion on May 28, 2014.

9. *Monster's and Lee's Tort Claims*

Monster and Lee filed this lawsuit against Beats, HTC, Wachter, Young and Iovine on January 6, 2015. The complaint's 11 causes of action were predicated on two distinct theories of fraud: Monster alleged Beats, assisted by HTC, defrauded it by relying on a sham transaction with HTC to improperly trigger the change of control provision in the 2009 license agreement. Lee alleged Beats and Wachter fraudulently induced him to sell his 5 percent interest in Beats back to the company in December 2012 and September 2013 for less than they knew it was worth.

10. *The Summary Judgment Motions*

Following extensive discovery, Beats, HTC and Wachter each moved for summary judgment on April 28, 2016. In its motion Beats argued contractual releases barred most of the claims alleged by Monster and Lee, and Monster and Lee could not challenge the releases as fraudulently induced because they had not rescinded the agreements containing the releases as required by California law. Beats additionally argued the tort claims based on allegations it had falsely represented a change of

12

control occurred when HTC acquired its 51 percent interest in Beats in 2011 failed because the undisputed evidence established as a matter of law the transaction was not a sham, as Monster contended. With respect to Lee, Beats argued it did not owe him any fiduciary duties and the statements upon which he purportedly relied when selling back his remaining interest in the company were true when made.

HTC's motion principally argued the undisputed facts established its acquisition of a 51 percent interest in Beats in 2011 was a legitimate business transaction and could not provide the basis for a claim it had aided and abetted any fraud or breach of fiduciary duty by Beats. HTC also disputed Monster's and Lee's claims that Beats owed them any fiduciary duties in the first place.

Wachter, in addition to pointing to Monster's and Lee's releases, argued, in part, there was no evidence his statements to Lee on September 13, 2013 were false; the comment that no liquidity events were on the horizon was a statement about future events, which is not actionable; and the evidence indisputably established that Lee did not reasonably rely on either of the statements in deciding to sell his remaining interest in Beats. Wachter also argued Monster and Lee were impermissibly attempting to hold him personally liable for actions taken in his capacity as a corporate manager of Beats.

11. *The Trial Court's Ruling Granting Summary Judgment*

The summary judgment motions were argued and taken under submission on August 10, 2016. On August 29, 2016 the court granted the motions.[4]

_____

[4] California Rules of Court, rule 3.1350(b) requires a party moving for summary adjudication to identify in the notice of

13

In its order the court ruled the 2009 license agreement gave Beats the unfettered right to terminate the agreement upon a change of control. Monster had no right of approval, and the change in control did not have to be objectively reasonable. Under *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342 (*Carma Developers*), the court continued, the covenant of good faith and fair dealing could not be read to prohibit Beats from entering into the HTC transaction based on the purported subjective intent of Beats's leadership to rid itself of its obligations to Monster. In addition, Monster and Lee failed to present any triable issue of fact to support the claim the 2011 acquisition was part of a sham transaction. Accordingly, all claims based on the purported misrepresentation a change of control had occurred fail as a matter of law.

The court also ruled no fiduciary relationship existed between Beats, on the one hand, and Monster or Lee, on the other hand, finding, in part, the 2009 license agreement did not create a joint venture between Monster and Beats. Accordingly,

motion and the separate statement of undisputed material facts the specific cause of action, affirmative defense, claims for damages or issues of duty to which the motion is directed. In its August 29, 2016 order the court explained the moving parties had failed to comply with this rule in their notice of motion. Accordingly, the court ruled, "[E]ach motion will be treated solely as a motion for summary judgment."

In a separate order, also filed August 29, 2016, the court sustained in part and overruled in part the moving parties' objections to Monster and Lee's evidence in opposition to summary judgment. Neither of those rulings has been challenged on appeal.

HTC could not be liable for aiding and abetting a breach of fiduciary duty. Finally, the court concluded the releases signed by Monster in 2012 and by Lee in 2012 and 2013 barred their claims against Beats and Wachter.[5]

## CONTENTIONS

Monster and Lee contend the trial court erred in granting summary judgment because they raised triable issues of fact whether Beats and Wachter committed fraud, aided by HTC, by misrepresenting that the Beats-HTC transaction constituted a bona fide change of control within the meaning of the 2009 license agreement. They contend, therefore, it was error to rule the release agreements barred their claims because triable issues of fact exist whether those releases were unenforceable as procured by fraud. Lee also contends triable issues of fact exist whether he was fraudulently induced to sell his remaining interest in Beats by Beats's and Wachter's failure to disclose Beats's ongoing negotiations with Apple.

## DISCUSSION

### 1. *Standard of Review*

A motion for summary judgment is properly granted when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review a grant of summary judgment de novo and, viewing the evidence in the light most favorable to the nonmoving party

---

[5]     The court also ruled in favor of the moving parties on Monster's eighth cause of action for unfair competition, which was based on the alleged unlawful conduct that formed the bases for its other causes of action. Monster does not challenge that ruling on appeal.

(*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618), decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law.  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 618.)

We may affirm an order granting summary judgment if correct on any of the grounds asserted in the trial court, regardless of that court's stated reasons, provided the parties have had an opportunity to brief the issue.  (Code Civ. Proc., § 437c, subd. (m)(2); see *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181; *Dominguez v. American Suzuki Motor Corp.* (2008) 160 Cal.App.4th 53, 57.)

> 2. *Monster and Lee Failed To Show Any Triable Issue of Material Fact To Support Their Claim the HTC Transaction Did Not Constitute a Bona Fide Change of Control Within the Meaning of the 2009 License Agreement*

In their opposition to the motions for summary judgment, Monster and Lee presented evidence Beats designed the HTC transaction specifically to trigger the change in control provision of the 2009 license agreement without ceding actual operating authority of its business.  By doing so, they contend, Beats violated the implied covenant of good faith and fair dealing in the 2009 license agreement and, as a consequence, misrepresented a change of control within the meaning of the agreement had occurred, permitting termination of the agreement.[6]  In addition,

---

[6]     Monster acknowledges it did not plead a cause of action for breach of contract or breach of the implied covenant of good faith

16

pointing to the timing of Beats's reacquisition of half of HTC's stake in the company in July 2012 (one month after Monster and Beats had agreed to the terms for termination of the 2009 license agreement, but nine months after the Beats-HTC transaction closed) and the fact the cash consideration paid by Beats was equal to the per-unit price HTC had paid, Monster and Lee assert they presented triable issues of fact as to whether the transaction was a sham. The first argument is legally flawed; the second insufficiently supported to survive summary judgment.

> ### a. *The implied covenant did not prohibit a transaction designed to effect a change in control*

Every contract contains an implied covenant of good faith and fair dealing that "'neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400.) This implied covenant is "read into contracts 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.'" (*Carma Developers*, *supra*, 2 Cal.4th at p. 373; see *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1120 (*Wolf*) ["the implied covenant will only be recognized to further the contract's purpose"].)

The implied covenant "finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." (*Carma Developers*, *supra*, 2 Cal.4th at p. 372;

---

and fair dealing and explains it relies on that provision only as a step in its fraud analysis.

17

accord, *Ladd v. Warner Bros. Entertainment, Inc.* (2010)
184 Cal.App.4th 1298, 1306-1307.)  Nonetheless, if the express
purpose of the contract is to grant unfettered discretion, and the
contract is otherwise supported by adequate consideration, then
the conduct is, by definition, within the reasonable expectation of
the parties and "can never violate an implied covenant of good
faith and fair dealing."  (*Carma Developers*, at p. 376 [lessor's
termination of lease for lessor's own financial gain was not
breach of implied covenant of good faith because it was expressly
permitted by the lease and therefore within parties' reasonable
expectations]; see *Wolf, supra,* 162 Cal.App.4th at pp. 1120-1121;
see also *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th
798, 808 ["courts are not at liberty to imply a covenant directly at
odds with a contract's express grant of discretionary power except
in those relatively rare instances when reading the provision
literally would, contrary to the parties' clear intention, result in
an unenforceable, illusory agreement"].)

   "[B]reach of a specific provision of the contract is not a
necessary prerequisite to a claim for breach of the implied
covenant of good faith and fair dealing."  (*Schwartz v. State Farm
Fire & Casualty Co.* (2001) 88 Cal.App.4th 1329, 1339; accord,
*Carma Developers*, *supra*, 2 Cal.4th at p. 373 ["breach of a specific
provision of the contract is not a necessary prerequisite" to an
action for breach of the implied covenant of good faith; "[w]ere it
otherwise, the covenant would have no practical meaning, for any
breach thereof would necessarily involve breach of some other
term of the contract"].)  However, a claim for breach of the
implied covenant "must show that the conduct of the defendant,
whether or not it also constitutes a breach of a consensual
contract term, demonstrates a failure or refusal to discharge

contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1395; see *Mosely v. Pacific Specialty Ins. Co.* (2020) 49 Cal.App.5th 417, 436 [same]; *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 86.)

Here, the 2009 license agreement expressly granted Beats the right to terminate its relationship with Monster for no reason at all after January 7, 2013 (the termination date of the original license agreement between Monster and Iovine and Dr. Dre) or at an earlier date upon the closing of a transaction that resulted in a change in control of Beats, as defined by the parties. The agreement did not require, as a condition for exercising either termination right, that Beats act for some reason other than a desire to withdraw manufacturing and distribution rights from Monster to hold for itself or to grant to another party.[7]

_____

[7]     Had Monster intended to limit Beats's right to terminate the 2009 license agreement prior to January 7, 2013 to situations involving "a change of control necessitated by the 'buyer' and not by Beats and its founders," as it now claims, it could have included that restriction in the agreement. It is not the function of the implied covenant of good faith and fair dealing to correct lapses of one party's negotiating team. (See generally *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 349-350 [the implied covenant of good faith and fair dealing "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement"].)

The cases Monster and Lee cite to support their argument are readily distinguished. For example, *Ladd v. Warner Bros. Entertainment, Inc.*, *supra*, 184 Cal.App.4th 1298, the primary case upon which they rely, was an appeal from a jury verdict in favor of profit participants in several movies. At trial the president of Warner's domestic distribution company admitted the company had a duty to act in good faith toward its profit participants, which included an obligation to "'fairly and accurately allocate license fees to each of the films based on their comparative value as part of a package.'" (*Id.* at p. 1307.) The issue on appeal was not the scope of the implied covenant, but whether substantial evidence supported the jury's finding that Warner had breached its admitted duty when it allocated the licensing fees. (*Ibid.*)

Similarly, in *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354 the court held that a triable issue of fact existed as to whether Warner had breached a development deal with Locke by categorically refusing to work with her. The court explained, "[W]hen it is a condition of an obligor's duty that he or she be subjectively satisfied with respect to the obligee's performance, the subjective standard of *honest satisfaction* is applicable." (*Id.* at p. 363.)

In marked contrast to the contracts in the cases cited by Monster and Lee, both clauses of the termination provision required only the occurrence of an objective event, not the exercise of discretion by Beats. Beats simply enforced its rights under the parties' agreement; it was not attempting to get more than it had bargained for.[8] (See *Carma Devoplers*, *supra*,

---

[8] Although the 2009 license agreement and its implied covenant of good faith do not limit Beats's motivation for entering

2 Cal.4th at p. 362 [distinguishing *Kendall v. Ernest Pestana, Inc.* (1985) 40 Cal.3d 488 and other cases with consent provisions, explaining, "[o]nly when one party attempts to obtain more from the bargain than it reasonably could expect, at the expense of the other, does a problem arise"].)  In sum, terminating the 2009 license agreement because it was in Beats's financial interest to do so did not—indeed, could not—frustrate the reasonable expectations of the parties and, therefore, did not make false Beats's representation that a lawful change in control had occurred.  (See *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1094 ["'[t]he implied covenant of good faith and fair dealing is limited to assuring compliance with the *express terms* of the contract, and cannot be extended to create obligations not contemplated by the contract'"].)

### b. *Monster and Lee failed to present evidence to support a finding the Beats-HTC transaction was a sham*

Emphasizing internal emails from Beats and HTC that indicate Beats never intended to relinquish real control of its operations, Monster and Lee label Beats's 2011 sale of a 51 percent interest in the company to HTC, coupled with Beats's subsequent buyback of half of HTC's holdings, a sham, fraudulent in nature and inadequate to trigger the change of control provision in the 2009 license agreement.  Monster and Lee failed to present sufficient evidence to defeat the motions for summary judgment directed to this aspect of their claims.

As discussed, the 2009 license agreement specified that "Change of Control" for purposes of the termination provision was defined in a separate document, titled Operating Agreement of

into a change of control transaction, the transaction itself must be legitimate, an issue we address in the following section.

Beats Electronics, LLC, entered into as of August 20, 2009 by the members of Beats, who included Dr. Dre, Iovine (through a trust) and Lee (through a trust). Paragraph 3.8 of the operating agreement defined that term to include "the acquisition after the date of this Agreement, directly or indirectly, by any Person or group . . . of the beneficial ownership of Units of the Company possessing more than 50% of the total combined voting power of all outstanding units of the Company." That is, the termination provision related to a formal change (direct or indirect) in ownership and voting power, not operational control of the company.[9]

As Monster and Lee admit, such a formal change took place in 2011. They also acknowledge HTC's conduct after the October 19, 2011 close of the Beats-HTC transaction, without considering the July 20, 2012 buyback, evidenced a genuine change of control within the meaning of the 2009 license agreement—a concession compelled by the evidence: HTC actually paid $300 million for its 51 percent share in Beats; it appointed four members to the seven-member Beats board; and it produced and sold HTC products using Beats technology and branding.

---

[9] Interpretation of a written instrument is solely a judicial function when, as here, it is based on the words of the instrument alone or there is no conflict in extrinsic evidence. (*City of Hope National Medical Center v. Genentech, Inc*. (2008) 43 Cal.4th 375, 395; see *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 ["[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence"]; *Wolf, supra*, 162 Cal.App.4th at p. 1134, fn. 18 [same].)

The additional evidence proffered concerning Beats's reacquisition of a portion of HTC's interest in the company in 2012 fails to create a triable issue of material fact concerning the bona fide nature of the their 2011 transaction. Relying on analogies to tax cases discussing the "step transaction doctrine" (see, e.g., *Shuwa Investment Corp. v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1650 ["purportedly separate transaction will be amalgamated into a single transaction when it appears they were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result"]) and securities cases involving "parking" (see, e.g., *Yoshikawa v. SEC* (9th Cir. 1999) 192 F.3d 1209, 1214 [securities "parking" involves a prearrangement to sell and then buy back securities to conceal true ownership for a bad-faith purpose, accomplished through a sham transaction in which nominal title is transferred to the purported buyer while the economic incidents of ownership are left with the purported seller]), Monster and Lee argue this "curiously timed second transaction" could be viewed by a jury as part of a single deal that did not effectively transfer to HTC ownership of a majority stake in Beats as required to invoke the termination provision in the 2009 license agreement.[10]

---

[10] In their reply brief, while explaining their argument, Monster and Lee concede a second transaction distant enough from the first is properly viewed, as a matter of law, as discrete. "If HTC had given up its controlling stake in Beats just 48-hours after acquiring it, there can be little doubt both the purchase and the buyback could justifiably be treated as a single transaction. Similarly, if the buyback had occurred, say, 2 years after HTC's acquisition, the Court could conclude as a matter of law that

Beats contends it is improper to import these theories from tax and securities law, which it describes as public-policy-based doctrines used to preclude tax-avoidance and securities fraud, into an ordinary contract dispute involving allegations of fraud, at least where the parties' agreement does not include a requirement that a triggering transaction be "bona fide" or meet a "substance," as well as a "form" test. To do so, Beats argues, would impermissibly allow the court to insert new terms into the parties' contract. (Cf. *Carma Developers*, *supra*, 2 Cal.4th at p. 374.)

We need not resolve that dispute. On this record Monster and Lee's evidence—the timing of the two transactions and the consideration paid in 2012—does not create a triable issue that the 2011 Beats-HTC transaction was not a legitimate change in ownership that triggered the termination provision in the 2009 license agreement. As discussed, for months after October 2011 HTC exercised its ownership rights, appointing a majority to the Beats board and developing and marketing products using Beats technology and bearing Beats branding. HTC's divestment of a portion of its ownership stake in Beats in July 2012, nine months later, as HTC explained, was driven by its concern the put rights given to Beats shareholders at the time of the 2011 transaction had created an unacceptable financial exposure and was achieved only after contentious negotiations. Nor was the consideration for the July 2012 transaction the same as the original transaction: In addition to paying for the shares at the initial per-unit price, Beats shareholders surrendered their put

---

there were two discrete transactions. Between these poles is a grey area that presents a factual question for the jury to resolve."

24

rights, which was HTC's primary goal; and HTC, in turn, agreed to loan Beats approximately $225 million.

Monster and Lee proffered no evidence to dispute HTC's legitimate business justification for its decision to divest a portion of its interest in Beats in the year following the acquisition. Similarly, they presented no evidence suggesting HTC intended from the outset to sell back a portion of that interest, let alone that there was any form of binding commitment to do so when HTC entered into the transaction in 2011. On this record, the inference Monster and Lee suggest from the timing of the two transactions is not sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the July 2012 divestment was simply a second step in a sham transaction. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 ["[t]here is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof"]; *Catholic Healthcare West v. California Ins. Guarantee Assn.* (2009) 178 Cal.App.4th 15, 23 ["[a] triable issue of fact exists when the evidence reasonably would permit the trier of fact, under the applicable standard of proof, to find the purportedly contested fact in favor of the party opposing the motion"].)

c. *Monster Has No Viable Constructive Fraud Claim Based on the 2011 Beat-HTC Transaction*

Monster contends the trial court improperly granted summary adjudication as to its fourth causes of action against Beats and Wachter for breach of a duty of trust and confidence and its fifth cause of action again Beats, Wachter and HTC for aiding and abetting that breach by resolving disputed issues of

25

fact to find the 2009 license agreement did not create a joint venture between it and Beats. Accordingly, it asserts, triable issues of fact exist whether Beats owed it fiduciary duties as a joint venturer and whether it breached those duties and committed constructive fraud in connection with the 2011 HTC transaction.

The only purported breach of fiduciary duty Monster identifies is Beats's failure to disclose its desire to terminate the 2009 license agreement and its intent to structure the 2011 transaction with HTC to allow it to do so. That is, even if not a sham transaction, Beats failed to disclose it had arranged to sell HTC a 51 percent interest in the company, rather than something less than 50 percent, while maintaining operational control. (See, e.g., *Los Angeles Memorial Coliseum Com. v. Insomniac, Inc.* (2015) 233 Cal.App.4th 803, 831 [there is a duty to disclose material facts when the parties are in a fiduciary relationship].) However, as discussed, the implied covenant of good faith and fair dealing in the 2009 license agreement did not limit Beats's right to terminate the agreement prior to January 7, 2013 to situations involving a change of control necessitated by the buyer, rather than by Beats. Consequently, Beats's motivation for a wholly legitimate transaction to which Monster was not a party could not be material to Monster. (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 977 ["[a] misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question'"]; see also *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 332 [a misrepresentation "may also be material if 'the maker of the representation knows or has reason to know that its recipient

26

regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it'"].)  Indeed, this lack of materiality, and, thus the failure of Monster to identify a viable cause of action for breach of fiduciary duty, is confirmed by Monster's failure to even suggest how it was harmed by Beats's nondisclosure of its rationale for the 2011 HTC transaction.  (See *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 & fn. 4 [actual damages are an essential element of constructive fraud].)

In sum, because the 2011 Beats-HTC transaction was properly invoked to trigger the termination provision in the 2009 license agreement, Monster's and Lee's fraud and breach of fiduciary duty claims and Lee's securities law claims[11]  to the extent based on that transaction fail as a matter of law.  In light of our ruling on the substance of Monster's and Lee's claims concerning the Beats-HTC transaction, we need not address the parties' dispute regarding the enforceability of the releases given by Monster and Lee as they relate to that transaction.

---

[11]     Lee's ninth cause of action for violations of Corporations Code sections 25400 and 25500 relates solely to the Beats-HTC transaction.  Section 25400 prohibits transactions that involve no change in the beneficial ownership of a security to create a false or misleading appearance of active trading in the security—that is, market manipulation.  (See *Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1048.) Section 25500 authorizes a private action to recover damages for anyone injured by a violation of section 25400.  Whatever other fundamental flaws this cause of action might have, it fails because the Beats-HTC transaction involved a genuine change in ownership of the Beats units involved in the October 2011 and July 2012 transactions.

3. *Lee Failed To Raise a Triable Issue of Material Fact Supporting His Claims Against Beats and Wachter*[12]

As discussed, Lee sold his 5 percent interest in Beats back to the company in two transactions: 3.75 percent in December 2012 for $14.1 million pursuant to his put right, documented in the December 20, 2012 unit repurchase agreement; and the remaining 1.25 percent in October 2013 for $12.9 million, documented in the October 30, 2013 unit repurchase agreement.

a. *The December 2012 sale*

In the complaint Lee alleged he resold his 3.75 percent interest in late 2012 because he was "[f]earful that he did not have the required transparency vis-a-vis his investment in Beats." It is undisputed the amount paid for Lee's units was fixed by a formula specified in the 2009 unit grant and repurchase rights agreement and based on the $300 million paid by HTC for 51 percent of the company in September 2011.[13] Lee

---

[12]   Lee asserts his second cause of action for fraud and deceit, sixth cause of action for breach of fiduciary duty, and ninth, 10th and 11th causes of action for violations of California securities laws against Beats and Wachter. Although his seventh cause of action for aiding and abetting breach of fiduciary duty names "all defendants," which includes HTC, the only breach of fiduciary duty identified concerns Lee's sale of his remaining 1.25 percent interest in Beats, a transaction that did not involve HTC. Accordingly, the trial court properly granted HTC's motion for summary judgment against Lee.

[13]   The agreement provided, "[I]f the Put Right is exercised in connection with a termination of the Monster Agreement pursuant to Section 14.3 as a result of a Change of Control transaction, [Lee] shall be paid the amount and form of

28

did not allege that any false statements or misrepresentations had been made to him in connection with that transaction or that Beats or Wachter failed to disclose any material information—an absence of charging allegations that Wachter noted in his motion for summary judgment.

In his declaration in opposition to the motion for summary judgment, however, Lee attempted to expand this aspect of his claim, stating that, by the time he decided to exercise his put right, Beats had obtained a substantially higher valuation than the one used in the HTC transaction. He declared he would not have sold any of his units had that subsequent valuation been disclosed to him. In his reply memorandum Wachter correctly argued that summary judgment may not be defeated based on claims not raised by the pleadings.

"To create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings." (*Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264; see *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [an appellate court reviewing a ruling on a motion for summary judgment "'identif[ies] the issues framed by the pleadings'"].) Although a court is "empowered to read the pleadings broadly," the pleadings must "give fair notice to the opposing party of the theories on which relief is generally being sought." (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 422.) "In assessing whether the issues raised by [the] plaintiff in opposing summary judgment are encompassed by the controlling pleading, . . . the pleading must allege the essential facts ""with reasonable precision and with particularity sufficient to acquaint

consideration paid to the other owners of the Company in such Change of Control transaction."

29

a defendant with the nature, source and extent of [the] cause of action."'"" (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 585.) ""'"[A] party cannot successfully resist summary judgment on a theory not pleaded."'"" (*Comunidad en Accion v. Los Angeles City Council* (2013) 219 Cal.App.4th 1116, 1125.)

Monster and Lee repeat in the factual summary of their opening brief Lee's criticism of Beats for not revealing the subsequent, higher valuation of the company before Lee exercised his put rights, and include a conclusory assertion this omission provides Lee with viable securities law claims against Beats and Wachter under Corporations Code sections 25401 and 25504.1. But they do not address in either their opening or reply briefs their failure to plead this theory, let alone attempt to justify reversal of summary judgment based on a fraud claim first presented in their opposition papers. (See *Johnson v. The Raytheon Co., Inc.* (2019) 33 Cal.App.5th 617, 636 ["'[t]o create a triable issue of material fact, the opposition evidence must be directed to issues raised by the pleadings'"].)

b. *Lee's sale of the remaining 1.25 percent*

As discussed, without revealing the covert recording of his September 13, 2013 telephone conversation with Wachter, Lee alleged in the complaint that the sale of his remaining 1.25 percent interest in Beats had been fraudulently induced by Wachter's unequivocal, affirmative misrepresentation during the call that "[t]here will be no liquidity event in the next year or two; nothing is on the horizon." The same inaccurate quotation from the conversation was presented to the trial court in Lee's declaration in opposition to the motion for summary judgment

30

and summarized in Lee's response to the moving parties' separate statements of undisputed facts.

The secret recording of the September 13 conversation, ultimately disclosed to Beats and Wachter and provided to the trial court before argument on the summary judgment motions, confirmed Wachter had not made the emphatic statement described, but rather opined, "At some point we'll exit, but I mean, I don't think anything—I doubt there will be any other liquidity event in the next year or two because we're doing this big private equity deal and so you know, anything is possible. I mean, you know, it could be that down the road we pay a dividend, or we do another deal and sell the company, but there is nothing on the horizon."

Aware of the actual language used by Wachter and faced with its disclosure to Beats and the court, Lee shifted the focus of his actual and constructive fraud claims from an allegation he sold his remaining 1.25 percent in the company based on affirmative misrepresentations to an argument that, even if nothing definite had yet been negotiated with Apple, there was a triable issue of material fact whether Wachter and Beats breached their duty to disclose to him the ongoing discussions with Apple, quoting *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194, 201: "One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." (See *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1164-1165 ["intentional concealment exists when a party to a transaction, who is under no duty to speak, nevertheless does speak and suppresses facts which materially qualify the facts stated"]; *Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 291 ["[a]ctive concealment or

31

suppression of facts by a nonfiduciary 'is the equivalent of a false representation, i.e., actual fraud'"].) Lee declared in opposition to the motions, "Had I known Apple was in any acquisition discussions to buy Beats during September and October 2013, I would not have sold any of my interest in Beats."

Beats and Wachter might be correct that the discussions with Apple during fall 2013 were at such a preliminary stage that no disclosure was necessary. (See, e.g., *Ins. Underwriters Clearinghouse, Inc. v. Natomas Co.* (1986) 184 Cal.App.3d 1520, 1528 ["it is unnecessary to disclose, in connection with a purchase or sale of securities, the occurrence of preliminary merger discussions or negotiations"; such discussions are "immaterial as a matter of law" because "their disclosure may itself be misleading, and might do more harm than good"].) However, the evidence underlying the parties' disputes concerning the nature and extent of the negotiations at that time is sufficient to preclude summary judgment on that basis.

Nonetheless, under Delaware law, which the parties agreed would govern the validity, interpretation and effect of the 2013 unit repurchase agreement, "sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." (*H-M Wexford LLC v. Encorp, Inc.* (Del. Ch. 2003) 832 A.2d 129, 142, fn. 18; see *RAA Mgmt., LLC v. Savage Sports Holdings, Inc.* (Del. 2012) 45 A.3d 107, 119 [affirming dismissal of claims because barred by the nonreliance provisions in the parties' nondisclosure agreement; Delaware law and public policy favor "enforcing contractually binding written disclaims of reliance on representations outside of a final agreement of sale or merger"];

*Prairie Capital III, L.P. v. Double E Holding Corp* (Del. Ch. 2015) 132 A.3d 35, 50 ["Delaware law enforces clauses that identify the specific information on which a party has relied and which foreclose reliance on other information"]; see also *ABRY Partners V, L.P. v. F&W Acquisition LLC* (Del. Ch. 2006) 891 A.2d 1032, 1059 [comprehensive nonreliance clauses will enable parties "to escape responsibility for their own fraudulent representations made outside of the agreement's four corners," but will not permit a contracting party to avoid a rescission or damages claim "based on a false representation of fact made within the contract itself"].)[14]

---

[14] Lee's argument we may disregard the parties' choice of Delaware law to govern the 2013 unit repurchase agreement because Delaware law permitting the enforcement of a nonreliance clause conflicts with this state's fundamental public policy and California's interest in the transaction materially outweighs Delaware's is not persuasive. (See *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 470 ["a valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates"].)

Beats was incorporated in Delaware. Accordingly, there unquestionably was a reasonable basis for selection of Delaware law. (See *Pitzer College v. Indian Harbor Ins.* Co. (2019) 8 Cal.5th 93, 100-101 [first step in evaluating enforceability of a contractual choice-of-law provision is to determine whether the chosen state has a substantial relationship to the parties or their transaction or whether there is any other reasonable basis for the choice].) Indeed, under the internal affairs doctrine, Delaware had an overriding interest in Beats's repurchase of its own

shares.  (See *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1106, fn. 2 ["[a] conflict of laws principle known as the 'internal affairs doctrine' posits that only one state—usually the state of incorporation—should have the authority to regulate a corporation's internal affairs"]; *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 144 Cal.App.4th 434, 442 ["'internal affairs' include . . . "'the purchase and redemption by the corporation of outstanding shares of its own stock'"'"].)

In addition, the split in California authority concerning the validity of a nonreliance provision (compare *Fisher v. Pennsylvania Life Co.* (1977) 69 Cal.App.3d 506, 511 [enforcing nonreliance provision] with *Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Development Corp.* (1995) 32 Cal.App.4th 985, 990 [declining to enforce a nonreliance provision] precludes a finding that applying Delaware law to this issue would contravene a fundamental policy of California.  (See *Pitzer College*, at p. 101 [if the chosen state's law is not contrary to a fundamental policy of California, "the court shall enforce the parties' choice of law"].)

Finally, contrary to Lee's argument, Corporations Code section 25701, which voids "[a]ny condition, stipulation or provision purporting to bind any person acquiring any security to waive compliance with any provision of this law," does not evidence a fundamental state policy barring enforcement of the nonreliance provision in this case.  By its terms, section 25701 applies only to waivers by the buyer of securities, not the seller, as Lee was here.  The case law interpreting section 25701 confirms its scope is limited to protecting the rights of "a California buyer of securities."  (E.g., *Intershop Communications AG v. Superior Court* (2002) 104 Cal.App.4th 191, 200 [section 25701 "provides that a California buyer of securities cannot waive the protections of the California securities laws"]; *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 418 ["we believe the right of a buyer of securities in California to have California law and its concomitant nuances

In agreeing to sell his remaining 1.25 percent interest in Beats, Lee agreed, in part, "Except for the representations and warranties made by the Company in this Section 6, neither the Company nor any other person makes any representation or warranty with respect to the Company or its subsidiaries or their respective business, operations, assets, liabilities, condition (financial or otherwise) or prospects, notwithstanding the delivery or disclosure to [Lee] or [his] representatives of any documentation, forecasts, projections, estimates, budgets or other information with respect to any one or more of the foregoing. Except for the representations and warranties contained in this Section 6, the Company hereby disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any manager, officer, employee, agent, consultant, or representative of the Company)." Under governing Delaware law, Beats and Wachter were entitled to enforce this provision, disclaiming Lee's reliance on any otherwise actionable omission regarding the status of Beats's discussions with Apple in the fall of 2013. Summary judgment on Lee's claims, therefore, was properly granted.

---

apply to any future dispute arising out of the transaction is a 'provision' within the meaning of section 25701 which cannot be waived or evaded by stipulation of the parties to a securities transaction"]; see also *America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 14.)

## DISPOSITION

The judgments and postjudgment orders are affirmed.
Beats, HTC and Wachter are to recover their costs on appeal.


PERLUSS, P. J.


We concur:



SEGAL, J.



FEUER, J.